**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| The Evolutionary Level Above Human, Inc. d/b/a The Telah Foundation, an Arizona nonprofit corporation, | CASE NO. 3:22-CV-395-JD-MGG |
| Plaintiff, | |
| v. | |
| Steven Robert Havel, Cathy JoAnn Weaver, Jason Bartel, | |
| Defendants. | |

**BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

The Evolutionary Level Above Human, Inc. d/b/a The Telah Foundation (the "Foundation" or "Plaintiff") hereby requests the Court to enter a preliminary injunction that prohibits Stephen Havel ("Mr. Havel") and Jason Bartel ("Mr. Bartel")[1] from infringing upon Plaintiff's copyrights, requires Mr. Havel and Mr. Bartel to deliver copyrighted materials to Plaintiff's counsel, and requires Mr. Havel and Mr. Bartel and/or various online platforms to take down certain accounts and webpages that contain Plaintiff's copyrighted materials.

---

[1]     As explained in Section IV, below, Defendant Cathy Weaver ("Ms. Weaver") filed a Petition for Bankruptcy on October 27, 2022.  Plaintiff learned of Ms. Weaver's bankruptcy in mid-November as Plaintiff was about to file an earlier version of this Motion which also sought to enjoin Ms. Weaver.  Ms. Weaver's filing has thrown a wrench in Plaintiff's initial thoughts on the scheduling of this matter, for fear of running afoul of 11 U.S.C. § 362.  Over the past two months, Plaintiff's counsel has been in contact with the Bankruptcy Trustee seeking to have the automatic stay lifted.  The Trustee, who has been made aware of Ms. Weaver's misconduct, has stated that she will not oppose a Motion to Lift the Stay, which will be filed in the United States Bankruptcy Court for the District of Indiana.  Once the stay is lifted, Plaintiff intends to file a substantially similar motion seeking to enjoin Ms. Weaver.

## I.     <u>INTRODUCTION REGARDING HEAVEN'S GATE.</u>

Total Overcomers Anonymous, T.O.A., or Heaven's Gate ("Heaven's Gate") was a group that gained notoriety in 1997, when the majority of its members (39 members) engaged in a ritualistic mass suicide that coincided with the approach of the Hale-Bopp Comet.

This action involves Defendants Mr. Havel, Ms. Weaver, and Mr. Bartel's (collectively, the "Defendants") infringement of the intellectual property that was the property of Heaven's Gate, which is now owned by Plaintiff.  Defendants' infringement and exploitation of these powerful materials is not only unlawful, but Defendants' widespread distribution of such powerful materials presents a risk that the events from 1997 will reoccur.

## II.    <u>OVERVIEW OF DEFENDANTS' INTENTIONAL AND ONGOING INFRINGEMENT OF PLAINTIFF'S INTELLECTUAL PROPERTY.</u>

### A.     **Plaintiff Is the Registered Owner of Copyrights and Trademarks of Heaven's Gate.**

Throughout the 1980's and 1990's Heaven's Gate created a number of works, including the following:

- A series of audio tapes (the "Audio Works");
- Certain video works (the "Video Works");
- A literary work entitled "How and When Heaven's Gate' (the door to the physical kingdom level above human) may be entered: an anthology of our materials" (the "Literary Work"); and
- A visual work of "The C.B.E." (the "Visual Work")

[Doc. 1 (Complaint) at ¶¶ 8–25; Declaration of Mark King, attached hereto as Exhibit A, at ¶¶ 4-6, 9]  Heaven's Gate also adopted and used trademarks in connection with its work (the "Trademarks").  [King Declaration, Exh. A, at ¶ 7]

Plaintiff, which is a not-for-profit organization, acquired the intellectual property rights related to these works and trademarks in or around 1999, following the passing of the 39 Heaven's Gate members and after a lengthy court battle.  [King Declaration, Exh. A, at ¶ 8]

### B.      Defendants Have Willfully Violated Plaintiff's Rights.

Defendants have violated Plaintiff's copyright protections and intellectual property rights.

### 1.      Defendants Havel and Weaver's Infringements.

For example, beginning in September 2021, Defendants Havel and Weaver started broadcasting the audio works on the 3spm YouTube channel, which belongs to Mr. Havel but is operated by Mr. Havel and Ms. Weaver, and advertising these public performances on Mr. Havel's Twitter channel as shown here:



[King Declaration, Exh. A, at ¶¶ 10-12; Answer of Havel, Doc. 20, at 16-18, ¶ 40; Answer of Weaver, Doc. 26, at 10-11, ¶ 40]

When these public performances of Plaintiff's copyrighted materials began in the Fall of 2021, Plaintiff demanded that Defendants stop infringing on Plaintiff's copyrights and Plaintiff sought to resolve this matter amicably.   [King Declaration, Exh. A, at ¶ 13] Defendants have refused all such overtures.  [King Declaration, Exh. A, at ¶¶ 14]

The "3spm" YouTube channel contains many videos that infringe on Plaintiff's copyrighted content. [King Declaration, Exh. A, at ¶ 16] For example, Defendants Havel and Weaver have played the following audio tapes:

> Tape No. 149 - Broadcast on YouTube 3spm channel on 11/08/21
> Tape No. 263 - Broadcast on YouTube 3spm channel on 11/08/21
> Tape No. 004 - Broadcast on YouTube 3spm channel on 11/08/21
> Tape No. 030 - Broadcast on YouTube 3spm channel on 03/26/22
> Tape No. 161 - Broadcast on YouTube 3spm channel on 04/08/22
> Tape No. 156 - Broadcast on YouTube 3spm channel on 04/12/22
> Tape No. 011 - Broadcast on YouTube 3spm channel on 04/13/22
> Tape No. 054 - Broadcast on YouTube 3spm channel on 04/14/22
> Tape No. 052 - Broadcast on YouTube 3spm channel on 04/17/22
> Tape No. 050 - Broadcast on YouTube 3spm channel on 04/18/22
> Tape No. 200 - Broadcast on YouTube 3spm channel on 04/19/22
> Tape No. 201 - Broadcast on YouTube 3spm channel on 04/20/22
> Tape No. 202 - Broadcast on YouTube 3spm channel on 04/21/22
> Tape No. 203 - Broadcast on YouTube 3spm channel on 04/26/22
> Tape No. 204 - Broadcast on YouTube 3spm channel on 04/27/22

[Answer of Havel, Doc. 20, at 24, ¶ 51 ("admit[ting] that these are some of the audio tape[s] [Mr. Havel] played for the public").] Moreover, Mr. Havel and Ms. Weaver have used Plaintiff's registered copyrighted "C.B.D." image, as shown here:



[King Declaration, Exh. A, at ¶ 16]

Mr. Havel and Ms. Weaver have also used their YouTube channel to disseminate the URLs of the copyrighted recordings that have been impermissibly uploaded to Google drive and made available by Defendants.  [King Declaration, Exh. A, at ¶ 17]  For example, on May 13, 2022's live stream, Ms. Weaver states: "There's several tapes, there are over 900-plus tapes available, audios, which we've been playing on the channel and if you email us we can give you a link to the google drive and point out specific tapes…"  [King Declaration, Exh. A, at ¶ 18]  As explained in the next section, Mr. Bartel has distributed en masse Plaintiff's copyrighted materials.

### 2.     Defendant Bartel's Infringements.

Mr. Bartel goes by an alias of "crlody."  Mr. Bartel's Answer confirmed that he is also known as "Crlody."  [Doc. 35 at 4, ¶ 6]

On or about August 2021, Mr. Bartel posted an archive of the Audio and Video Works online, which was taken down by a DMCA request.  [King Declaration, Exh. A, at ¶¶ 19-20; *see also* Havel's Answer, Doc. 20, at 25 (avowing that "Bartel posted those audios on 4shared.com in 2021"); Bartel's Answer, Doc. 35, at 15-16, ¶ 37 (admitting that "Plaintiff[] had shut down [Bartel's] 4shared account")]

Following the removal of the archive, Mr. Bartel then created two additional archives on Google Drive that allow for individuals to freely download the Foundation's copyrighted material.  [King Declaration, Exh. A, at ¶ 21]

Mr. Bartel also encourages people to contact him for access to a third cache of the Foundation's copyrighted materials, on his personal blog:



**The 4shared accts have been shut down by TELAH but the google drives still have Ti and Do's audio tapes**

Posted on April 18, 2022 by crlody

Someone recently asked for access to the 4shared accts with the class' audio tapes. Mark King had them shut down for "copyright violations".

All the tapes can be found here,

https://drive.google.com/drive/u/2/folders/11ExoXaKa_mFbmHQvhSSuVBROeOMlwse3

https://drive.google.com/drive/u/3/folders/1UpGPvvEKMKyVgZNZeW4XGKpcMxDocLpn

One can send an e-mail to crlody@protonmail.com for access to a third drive.

[King Declaration, Exh. A, at ¶¶ 22-23]

On August 19, 2022, Mr. Bartel posted tapes 1-218 on his blog.  [King Declaration, Exh. A, at ¶ 24; *see also* Exhibits 1-2 to Exhibit A]

Mr. Bartel's Answer "admits . . . that audio tapes produced by the Group were being sent to [Mr. Bartel] by Defendant Havel."  [Bartel Answer, Doc. 35, at 13, ¶ 29]  Mr. Bartel's Answer also describes his dissemination of Plaintiff's materials:

> Defendant admits that he uploaded audio works produced by the Group to multiple Google Drives and to 4shared for free download and Defendant further admits to providing the audio works produced by the Group to a College Professor on a thumb drive free of charge.  Defendant further admits to placing 30 gigs of audio works produced by the Group on a private google drive and inviting many individuals, including one retired and one active College Professor, to access said audio works of the Group . . . .

[Bartel Answer, Doc. 35, at 13-14, ¶ 30]

On October 12, 2022, Mr. Bartel wrote a comment on his blog that "I'm getting sued for putting [Plaintiff's] tapes on free, file sharing sites."  [King Declaration, Exh. A, at ¶ 25; *see also* Exhibit 3 to Exhibit A]

On October 19, 2022, Mr. Bartel posted on his blog:

> To hell with going dark.This [sic] archive of the [Heaven's Gate] audio tapes wouldn't be possible without the work of an individual who risked incurring the "legal" wrath of the incredibly petty couple Mark and Sarah King, these tapes belong to the world, not a Corporation formed six months after the class left this world[.]

[King Declaration, Exh. A, at ¶ 26; *see also* Exhibit 4 to Exhibit A]  Mr. Bartel's October 19, 2022, post contains a link to a website that contains an audio library of "Heaven's Gate Audio Tapes" and the website states "These files have been made available to me through an ex-member who goes by the name crlody. Here is their blog about The TELAH Foundation: https://crlody.wordpress.com/."  [King Declaration, Exh. A, at ¶ 27; *see* Exhibit 5 to Exhibit A]

### C.  Defendants' Stated Intention to Keep Infringing.

Defendants are actively engaged in a conspiracy to commit copyright infringement. [King Declaration, Exh. A, at ¶ 28]  A fact that they have explicitly stated on the website belonging to or being operated by Mr. Havel and Ms. Weaver where they trumpet the fact that they will not stop infringing even with court intervention:

> So just weeks ago, [a third party] who I had been in contact with on and off for years sent me the digitized audios, all in .mp3 format and I quickly sent them to [Defendant Bartel] and someone else who I know I can trust to be sure to upload them to the internet in mulitple [sic] places so that even if [the Foundation] somehow sue us it will be far too late to keep them from being available to those who want to listen to them.

[King Declaration, Exh. A, at ¶¶ 28-29; *see* Doc. 1-8 at 4]

Additionally, as set forth in the prior section, Mr. Bartel recently announced, "To hell with going dark," while simultaneously sharing Plaintiff's copyrighted materials.  [Exhibit 4 to Exhibit A]

### D.  Plaintiff Filed This Lawsuit to Curtail Defendants' Unlawful Actions.

To stop Defendants' unlawful actions, Plaintiff has brought this action, asserting claims for copyright infringement, conspiracy to commit copyright infringement, and trademark infringement. [Doc. 1]

### E.  Defendants Have Possibly Spoliated Evidence and Have Stated that They Will Not Produce Electronically Stored Information.

It is possible that Defendants have spoliated evidence.  For example, Mr. Havel's Answer states that he has "removed" certain online posts from his "YouTube channel and Facebook page and Blog" where he played Plaintiff's protected audiotapes.  [Doc. 20 at 26, 68 at, ¶ 20]

Mr. Havel's Status Report states that he "will not agree to produc[e] any Electronically Stored Information." [Doc. 49 at 6, ¶ 3(c))]  Ms. Weaver affirmatively requested that the Court prohibit the inspection or her laptop or cellphone.  [Doc. 48 at 2-3, ¶ 3]  Mr. Bartel has

requested the Court prohibit Plaintiff from inspecting Mr. Bartel's "personal devices[,] including cell phones and computers nor any notebooks or ledgers."  [Doc. 59 at 6, ¶ 3]

### F.    The Court Has Already Ruled that Plaintiff Has a Reasonable Likelihood of Succeeding on Its Copyright Infringement Claims.

Plaintiff previously sought on an ex parte basis a temporary restraining order and preliminary injunction against Defendants.  [Docs. 8-9]  Although on May 27, 2022, the Court denied the Motion's because it was requested ex parte, the Court found that:

1.    Plaintiff is the owner of the following valid copyrights:

- A lithographic print titled "The C.B.E. (Celestial Being Entity)" [Doc. 1-6];

- A literary work titled "How and When 'Heaven's Gate' (The Door to the Physical Kingdom Level Above Human) May be Entered – an Anthology of Our Materials" [Doc. 1-7];

- Sound recordings titled "The Audiotape Library of Heaven's Gate by Ti and Do" [Doc. 1-1]; and

- A collection of audiovisual works titled "Beyond Human – The Last Call." [Doc. 1-2]

[Doc. 11 at 5]

2.    Defendants copied Plaintiff's copyrighted works as "evidenced by Defendants Havel and Weaver's live streams of the audio works [King Decl. DE 9-1 ¶ 7], their live stream of themselves reading aloud the literary work [DE 1 ¶ 49; DE 9-1 ¶ 2], their usage of the C.B.E. image on both thumbnails and on merchandise [King Decl., DE 9-1 ¶¶ 14, 17], and by Defendant Bartel posting archives of the copyrighted audio and audiovisual works online (*Id.* ¶¶ 9–13).")." [Doc. 11 at 6]

3.    Plaintiff "has a reasonable likelihood of succeeding on its copyright infringement claims."  [Doc. 11 at 6]

### G. Defendants' Filings Further Substantiate Defendants' Unlawful Actions.

Defendants' filings in this action confirm that Defendants have infringed on Plaintiff's intellectual property rights.

### 1. Filings that Confirm Mr. Havel's Infringement.

1. Mr. Havel admitted to "quickly sen[ding] [hundreds of audio cassette tapes that were registered by the foundation with the United States Copyright Office in 1997] to [Defendant Bartel] and someone else who [Havel] know[s] [he] can trust to be sure to upload them to the internet in mulitple [sic] places so that even if [the Foundation] somehow sue [Defendants] it will be far too late to keep [Plaintiff] from being available to those who want to listen to them."   [Doc. 20 at 12-13, ¶¶ 35-36]

2. Mr. Havel admitted that he "sen[t] Bartel (Carlan, aka Crlody) a thumb drive containing digitized audio tapes." [Doc. 20 at 13, ¶ 35]

3. Mr. Bartel's Answer confirms that "Defendant [Bartel] was provided with 929 audio works in 2021 by Defendant Havel" and confirms that at a minimum "486" of those "Audio Works have been registered according to the copyright registration provided by Plaintiff[]."   [Doc. 35 at 9, ¶ 16]

4. Mr. Havel avowed that he "gave [Mr. Bartel] the thumb drive because [Mr. Havel] knew [Mr. Bartel], like [Mr. Havel], wanted those tapes for our own use and **to share with others**."   [Doc. 20 at 20, ¶ 45 (emphasis added)]

5. Mr. Havel admitted to "play[ing] audio tapes" that were registered copyrights. [Doc. 20 at 18m ¶ 40]

6. Ms. Weaver stated "[she] began participating in [Mr. Havel's] live streams where [Ms. Weaver and Mr. Havel] played the audio tapes and we also decided to make merchandise in the form of t-shirts." [Doc. 39-1 at 23]

7. Ms. Weaver confirmed that she and Mr. Havel "repeatedly play[ed] audio tapes and s[old] t-shirts." [Doc. 39-1 at 23]

8.      Ms. Weaver stated that she and Mr. Havel have played "15 audio tapes on the live stream and [Ms. Weaver and Mr. Havel] sold a total of 9 shirts at 32.50." [Doc. 39-1 at 23]

9.      Ms. Weaver stated that she and Mr. Havel "stopped selling the two shirt designs that contain what [Plaintiff] ha[s] finally proved via the exhibits [Plaintiff] presented with this lawsuit what [Plaintiff] ha[s] trademarked/copyrighted." [Doc. 39-1 at 23]

10.     Mr. Havel admitted selling shirts with Plaintiff's trademark.  [Doc. 20 at 28-29]

**2.      Filings that Confirm Ms. Weaver's Infringement.**

1.      Ms. Weaver confirmed that she "began participating in [Mr. Havel's] live streams where [Ms. Weaver and Mr. Havel] played the audio tapes and [they] also decided to make merchandise in the form of t-shirts." [Doc. 39-1 at 23]

2.      Ms. Weaver stated that she and Mr. Havel "repeatedly play[ed] audio tapes and s[old] t-shirts." [Doc. 39-1 at 23]

3.      Ms. Weaver stated that she and Mr. Havel have played "15 audio tapes on the live stream and [they] sold a total of 9 shirts at 32.50." [Doc. 39-1 at 23]

4.      Ms. Weaver stated that she and Mr. Havel "stopped selling the two shirt designs that contain what [Plaintiff] ha[s] finally proved via the exhibits [Plaintiff] presented with this lawsuit what [Plaintiff] ha[s] trademarked/copyrighted." [Doc. 39-1 at 23]

**3.      Filings that Confirm Mr. Bartel's Infringement.**

1.      Mr. Bartel "admit[ted] to playing numerous video tapes as well as 224 audio tapes" online.  [Doc. 35 at 12, ¶ 27]

2.      Mr. Bartel admitted to circulating Plaintiff's intellectual property to others. [Doc. 35 at 13-14, ¶¶ 29-31]

3.      Mr. Bartel avowed to being "very excited to share these audio tapes with anyone who would like to listen to them including a College Professor whom the Defendant sent a thumb drive containing audio tapes 1-929 produced by the Group." [Doc. 35 at 51-52, ¶ 132]

4.      Mr. Bartel's Answer confirmed that he is also known as "Crlody."  [Doc. 35 at 4, ¶ 6] "Crlody" has copied and disseminated Plaintiff's intellectual property.  [Doc. 9-1 at 3, ¶ 13; Doc. 9-1 at 9]

**H.      Defendants, Who Are Unfazed By Legal Action, Continue to Infringe.**

Defendants are committed to infringing Plaintiff's protected material, as evidenced by Defendants' statements below, many of which were made *after* this litigation began.

On November 3, 2021, Mr. Havel and Ms. Weaver stated:

Ms. Weaver: "Everyone is going to have the tapes, and they can take and duplicate them."

Mr. Havel: "How you going to stop people from doing that?"

. . .

Ms. Weaver: "…what's to say that the Next Level info won't go back under lock and key for another 24 years?  Well, it's not. . . because, I'm not going to let that happen.

Mr. Havel: "And a lot of people, actually who aren't going to let that happen."

[King Declaration, Exh. A, at ¶ 32]

In January 2022, Ms. Weaver stated:

"… [the files] are uploaded to a couple of different sites now actually, so, and it's great, keep them, I mean we shouldn't be saying that but… "Everybody destroy them, destroy them, wink, wink, don't really but say that you did…"

[King Declaration, Exh. A, at ¶ 33]

On March 28, 2022, Mr. Havel stated:

"And, uh, I don't intend to let this channel come down. And, even if it did I would start another one and then they would have to find me and, uh, you know, shut me down.  This isn't the first attempt on this channel and it won't be the last."

[King Declaration, Exh. A, at ¶ 34]

On April 8, 2022, on their YouTube channel, Ms. Weaver stated:

 "Go ahead and email us . . . email us if you don't know where the tapes are . . . please email us and we'll direct you to them."

[King Declaration, Exh. A, at ¶ 35]

On May 1, 2022, Mr. Havel stated:

"And, uh, and technically, um, they could hold me accountable for that, so I'm not going to say how many, I'm not gonna even try to guess, 'cus I don't remember. Uh, but, um, 'cus I can take the fifth that it would tend to incriminate me. So I'll do that, uh, even thought they could probably hear this tape and say, "oh you say that." So, I dunno. If that gets used against me, that's the way it goes. **They're still not going to get any money from me and it's not going to stop the material from circulating, because we're all, [Bartel] and myself, Cathy, and [a third party], and other people are circulating the tapes**."

[King Declaration, Exh. A, at ¶ 36 (emphasis added)]

On August 25, 2022, Mr. Bartel, aka Crlody, posted online "We made copies of the audio tapes and digitized them and put them on CD-ROMs. I still give away these CDs to this day."  [King Declaration, Exh. A, at ¶ 37]

On October 7, 2022, Mr. Havel and Ms. Weaver broadcast a "live stream" on YouTube, during which time Mr. Havel stated, "**maybe we'll lose, but that won't stop me and Kathy [Weaver] and [Mr. Bartel]** from telling the truth."  (Emphasis added) [King Declaration, Exh. A, at ¶ 38; *see* Exhibit 6 to Exhibit A]  Later in that stream, the following statements were made:

Ms. Weaver: "Once it's done and whatever the outcome is, if its not favorable, we're out of here."

Mr. Havel: "Right, but we don't know what we're going to do exactly."

Ms. Weaver: "**We're gonna share the fucking information. I know I shouldn't say that**, but like you said-"

Mr. Havel: "Well, yeah, **we're going to share the information one way or the other** –"

Ms. Weaver: "**And they won't be able to touch us**."

Mr. Havel: "You know, I'm not saying which information and how.  Maybe it's just out of our mouths from our memories because they don't use that against us –"

Ms. Weaver: "They're going to use everything against us.  That's why their shady, shady lawyers wanted us to call so they can trip us up but we already know that we don't have to do that so –"

Mr. Havel: "Right, we talked to the clerk today –"

Ms. Weaver: "-Nanny poo."

(Emphasis added).  [King Declaration, Exh. A, at ¶ 39; *see* Exhibit 7 to Exhibit A]

On October 7, 2022, Mr. Bartel posted on his blog an entry titled "New Link for the audio tapes," which contained a link to hundreds of Heaven's Gate tapes, and stated, in part, "To hell with [Telah's Directors]."  [King Declaration, Exh. A, at ¶¶ 40-41; *see* Exhibits 8-9 to Exhibit A]  The website containing hundreds of Heaven's Gate Tapes that was linked in Mr. Bartel's October 7, 2022, blog post states that "These files have been made available to me through an ex-member who goes by the name crlody." [King Declaration, Exh. A, at ¶ 41; Exhibit 9 to Exhibit A]

On October 19, 2022, Mr. Bartel announced, "To hell with going dark," while simultaneously sharing Plaintiff's copyrighted materials.  [King Declaration, Exh. A, at ¶ 42]

On November 3, 2022, Mr. Havel and Ms. Weaver broadcast a "live stream" on YouTube, during which time Ms. Weaver stated, "like they instigated this again right because we sold nine shirts and played less than 13 audios for free."  [King Declaration, Exh. A, at ¶ 43; *see* Exhibit 10 to Exhibit A]

On November 28, 2022, Mr. Bartel published a blog post titled "What [Plaintiff's Directors] don't want others to hear on the class' audio tapes," while simultaneously sharing Plaintiff's copyrighted materials.  [King Declaration, Exh. A, at ¶ 44; *see* Exhibits 11-12 to Exhibit A]

## I.     Defendants Havel and Weaver Have Been Promoting a Website that Copied the Website Operated by Telah and Have Been Promoting It.

Plaintiff owns and operates a website with the URL "https://www.heavensgate.-com/". [King Declaration, Exh. A, at ¶ 45; *see* Exhibit 13 to Exhibit A]  Mr. Havel and Ms. Weaver have been promoting a copycat website that has the URL "https://heavensgatealso.com/".

[King Declaration, Exh. A, at ¶ 46; *see* Exhibit 14 to Exhibit A] https://heavensgatealso.com/ is nearly identical to https://www.heavens-gate.com/, with the exception being that requests for materials are directed to "rep@heavensgatealso.com" instead of "rep@heavensgate.com." [King Declaration, Exh. A, at ¶ 47, *compare* Exhibit 13 to Exhibit A at 3, *with* Exhibit 14 to Exhibit A at 3]

Mr. Havel and Ms. Weaver admitted during a YouTube live stream on December 25, 2022, that "[they] have a website that [they]'re promoting [that]'s called heavensgatealso.com, which is the same code." [King Declaration, Exh. A, at ¶ 48; Exhibit 15 to Exhibit A]  Mr. Havel also stated that he offered to assist in changing the html code on the heavensgatealso.com website so that it listed a different email address, and Ms. Weaver stated that there have been discussions so that emails sent to the rep@heavensgatealso.com email address would be delivered to Mr. Havel and Ms. Weaver.  [King Declaration, Exh. A, at ¶ 49; Exhibit 16 to Exhibit A]

> **J.      In January 2023, Mr. Bartel Shared Hundreds of Telah's Tapes and Thanked Others for Disseminating Telah's Protected Materials.**

On January 15, 2023, Mr. Bartel uploaded a blog post that contains a link to a website that contains an audio library of "Heaven's Gate Audio Tapes" and the website states "These files have been made available to me through an ex-member who goes by the name crlody." [King Declaration, Exh. A, at ¶ 50; Exhibits 17-18 to Exhibit A]

On January 16, 2023, Mr. Bartel published a blog post in which Mr. Bartel gives "[t]hanks to all who have tried to disseminate" the "audio tapes" and for "stand[ing] up" to the "Telah Foundation."  [King Declaration, Exh. A, at ¶ 51; Exhibit 19 to Exhibit A]

## III.     A PRELIMINARY INJUNCTION SHOULD BE ENTERED.

A party seeking a preliminary injunction must first show "that: (1) absent preliminary injunctive relief, [the party] will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) [the party] has a reasonable

likelihood of success on the merits." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661–62 (7th Cir. 2015).

Once the moving party has made such a showing, the Court "considers: (4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties (the 'public interest')." *Id.* at 662.  The Court's assessment of the fourth factor "is made on a sliding scale: 'The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'" *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018) (quoting *Ty, Inc. v. Jones Group, Inc*., 237 F.3d 891, 895 (7th Cir. 2001)).

A.      **The Court Has Already Ruled that Plaintiff Is Likely to Succeed on the Merits of Its Copyright Infringement Claims.**

The United States Copyright Act provides that "Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 or of the author as provided in section 106A(a), or who imports copies or phonorecords into the United States in violation of section 602, is an infringer of the copyright or right of the author, as the case may be." 17 U.S.C. § 501.  To succeed on the merits of their copyright infringement claim, the Foundation must establish (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.  *Muhammad-Ali v. Final Call, Inc*., 832 F.3d 755, 760 (7th Cir. 2016).

In this case, Plaintiff is the lawful assignee of all right, title and interest in and to the copyrighted works, including the Audio Works, Video Work, Literary Work, and Visual Work. [King Declaration, Exh. A, at ¶¶ 4, 8-9 (Registration Certificates attached to Complaint as Exhibits A, B, F, G.)]

Plaintiff has submitted extensive documentation, including Defendants' avowals, that Defendants are illicitly promoting and distributing copies of Plaintiff's copyrighted material, which is a violation of Plaintiff's rights under the Copyright Act.

The Court has already "f[ound] that the certificates of registration are prima facie evidence of valid copyrights over the aforementioned material by the Foundation" and "that the Foundation has made out a prima facie case that each of the defendants has copied, without authorization, original elements of the copyrighted works." [Doc. 11 at 5]

### B.    Plaintiff Has and Will Continue to Suffer Irreparable Harm Absent Injunctive Relief.

Harm is irreparable when it cannot be prevented or rectified by a final judgment after trial. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of Am., Inc.* 549 F.3d 1079, 1089 (7th Cir. 2008). An award of monetary damages does not preclude a finding of irreparable harm if, among other things:

> (1) the plaintiff is so poor that he would be harmed in the interim by the loss of the monetary benefits; (2) the plaintiff would be unable to finance his lawsuit without the money he wishes to recover; (3) the damages would be unobtainable from the defendant because it will be insolvent prior to the final judgment; and (4) the nature of the plaintiff's loss may make damages very difficult to calculate.

*Hamlyn v. Rock Island Cnty. Metro. Mass Transit Dist.*, 960 F. Supp. 160, 162 (C.D. Ill. 1997).

A final judgment will not rectify Plaintiff's irreparable harms that are caused by Defendants' unlawful activities because monetary damages will not rectify Plaintiff's damages and Defendants' actions could lead to the loss of life, which is an irreparable harm.

### 1.    Money Damages Are Inadequate.

Money damages are inadequate because: (1) Plaintiff, which is a not-for-profit corporation, will not be able to continue existing as a business or prosecuting this case without injunctive relief; (2) damages are difficult to quantify; (3) the ancillary damages—such as the possibility of lost life—cannot be remedies by damages; and (4) Defendants will not be able to pay an award of damages.

a)      **Plaintiff Will Not Be Able to Continue Absent Injunctive Relief.**

Plaintiff is a not-for-profit corporation that will not be able to continue to or prosecute this lawsuit without injunctive relief.  *See Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 386 (7th Cir. 1984) (holding that monetary relief is inadequate when "[t]he damage award may come too late to save the plaintiff's business" or "plaintiff may not be able to finance his lawsuit against the defendant").  As set forth in the Declaration attached as Exhibit 1:

1.      Plaintiff is a not-for-profit corporation.  [King Declaration, Exh. A, at ¶¶ 8, 54]

2.      The revenue generated through Plaintiff's operations is de minimis.  Plaintiff has been able to maintain its existence because its Plaintiff's directors have contributed funds so that Plaintiff can pay the de minimis expenses associated with Plaintiff's operations.  [King Declaration, Exh. A, at ¶ 52]

3.      The legal expenses associated with Plaintiff pursuing its claims against Defendants are not considered typical operating expenses.  Plaintiff's legal expenses have already greatly exceeded Plaintiff's business operations.  The cost of filing this action ($402) has exceeded the amount of annual income that Plaintiff earned in 2021.  The cost of serving Defendants, one of whom evaded service (Mr. Bartel), was significant. [*See* Doc. 31-1 at 2-7 (total of $1,955.45 in attempting to serve Mr. Bartel)]  [King Declaration, Exh. A, at ¶ 53]

4.      The expenses that Plaintiff has incurred in connection with its important and necessary legal action of Defendants are not sustainable for Plaintiff, which is a not-for-profit and does not generate a stream of revenue.  Moreover, because legal action is necessary to preserve and protect Plaintiff's rights, the failure to enter injunctive relief could have the ultimate effect of Plaintiff losing its intellectual property rights.  [King Declaration, Exh. A, at ¶ 54]

Moreover, as set forth in greater detail in Section III(B)(1)(d), at the end of trial, Plaintiff will not be able to recover damages from Defendants, who have avowed to the Court that they are indigent.

> **b)** **Actual Damages Are Difficult to Quantify, Especially Because Defendants Have Thwarted Plaintiff's Ability to Control the Distribution of Its Copyrighted Works.**

Upon prevailing in its copyright action against Defendants, Plaintiff has the choice of recovering either actual damages or statutory damages.  17 U.S.C. § 504; 17 U.S.C. § 504(c) (providing that the "copyright owner may elect" its remedy "at any time before final judgment is rendered").  A calculation of Plaintiff's actual damages will be difficult to calculate in this situation.

Plaintiff, cognizant of the powerful nature of the protected materials, has neither widely distributed the protected materials nor sold the protected materials for profit.  *See*, e.g., Defendant Bartel's Answer, Doc. 10, at 14, ¶ 31 ("Defendant admits to being grateful to Defendant Havel for providing the audio tapes produced by the Group that have been suppressed for over twenty years by the Plaintiff[].").  As such, it would be difficult to establish with reasonable certainty the amount of actual damages/lost profits that Plaintiff would have had if Plaintiff charged consumers for its protected materials.

Additionally, Defendants have distributed and made available Plaintiff's protected materials to various recipients, each of whom may have redistributed those materials. Defendants' distribution of the protected materials has frustrated Plaintiff's rights to control the distribution of its protected materials, and Defendants' actions have also necessarily diluted the market value of the materials in an unknown amount by making the materials available to anyone with access to the internet.

The irreparable harm in this case is similar to that in *Fitzgerald v. Murray*, which held that the plaintiff suffered irreparable harm because the plaintiff's "right to control the distribution of its copyrighted materials" was denied by the defendant, who made repeated attempts to widely disseminate [the] infringing book and ha[d] encouraged others to share the

book." No. 121CV01822TWPTAB, 2021 WL 7502265, at *4 (S.D. Ind. Oct. 20, 2021), *reconsideration denied*, No. 121CV01822TWPTAB, 2021 WL 5754846 (S.D. Ind. Dec. 3, 2021). Defendants have opened Pandora's box by distributing Plaintiff's protected materials and encouraging others to redistribute those materials. [King Declaration, Exh. A, at ¶¶ 10-51]

### c)      The Possibility of Loss of Life Is Irreparable.

A final monetary judgment is not able to rectify the loss of life, a result which could reoccur if Defendants continue to distribute the Heaven's Gate materials.

In *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, the court held that the plaintiff's desire to commit suicide because of the defendant's policy was a prospective harm cannot "be compensated by monetary damages" and that there was not "an adequate remedy for preventable 'life-long diminished well-being and life functioning.'" 858 F.3d 1034, 1046 (7th Cir. 2017).

Similar to the policy at issue in *Whitaker*, Defendants' ongoing unlawful actions in this case could result in the loss of life.[2] Following the mass suicide of 39 Heaven's Gate members, history repeated itself, and four others took their own life in a similar manner and/or because of the Heaven's Gate teachings. The protected materials that are at issue in this case are powerful and have already resulted it in the loss of life, and Defendants' unlawful distribution of materials at issue could result in more loss of life, which is priceless and cannot be redressed by money damages.

### d)      Money Damages Are Unobtainable from Defendants Who Have Avowed to Lack Assets.

An award of money damages does not remedy harm when damages are unobtainable. The Seventh Circuit has explained that the unobtainability of damages depends "on two factors

---

[2]     In *Whitaker*, an expert report addressed the plaintiff's suicidal ideations. Here, history confirms that the materials could lead to suicide, as evidenced by nearly all of Heaven's Gate members committing mass suicide based on the message of Heaven's Gate.

—the appellees' resources and the potential magnitude of eventual damages." *Signode Corp. v. Weld-Loc Sys., Inc.*, 700 F.2d 1108, 1111 (7th Cir. 1983).

Assuming for the sake of argument that Plaintiff will elect to recover its statutory damages, Plaintiff could establish at least 224 violations by Mr. Bartel, at least 486 violations by Mr. Havel, and at least 15 violations by Ms. Weaver.   The evidence presented herein confirms that Defendants' infringements have been committed willfully, and the Court could exercise its discretion to "increase the award of statutory damages to a sum of not more than $150,000" per violation.   17 U.S.C. § 504(c)(2).   The table below sets forth the amounts that can be awarded under 17 U.S.C. § 504:

| No. | Defendant | No. of Infringed Works | Min. Award under 504(c)(1) ($750) | Max Award under 504(c)(1) ($30,000) | Max Award under 504(c)(2) ($150,000) |
|---|---|---|---|---|---|
| 1. | Bartel | 224 [Doc. 35 at 12, ¶ 27] | $168,000 | $6,720,000 | $33,600,000 |
| 2. | Havel | 486 [Doc. 35 at 9, ¶ 16] | $364,500 | $14,580,000 | $72,900,000 |
| 3. | Weaver | 15 [Doc. 39-1 at 23] | $11,250 | $450,000 | $2,250,000 |

Plaintiff would not be able to recover the damages set forth on the table above, which are likely understated.   Indeed:

1.   Mr. Bartel has represented to the Court that he "has limited financial resources" and is unable "to afford [p]rocess [s]ervers."   [Doc. 61 at 2]  The cost to serve process is less expensive than the $750 in minimum award statutory damages per violation.  *See*, e.g., Doc. 31-1 at 2-7 (affidavits of non-service reflecting cost of each attempted service on Mr. Bartel, each of which were for less than $750).

2.   Mr. Havel has avowed under penalty of perjury that his "financial hardship" precludes him from "hir[ing] a Process Server" and that he is unable to "afford an attorney."

[Doc. 15 at 1]  Mr. Havel does not work and, with the exception of a $12,500 loan that Mr. Havel took out, has "about $10,000" as of June 14, 2022, and that is "all [Mr. Havel] ha[s]." [Doc. 15-1 at 31]  Ms. Weaver avowed that Mr. Havel gave the $12,500 loan to Ms. Weaver, who immediately spent "$8,000 of which." [Doc. 14-1 at 32]  It appears that whatever funds Mr. Havel had has been exhausted on Ms. Weaver and elsewhere.  On October 21, 2022, Mr. Havel avowed that he was "without savings and live[s] on a fixed social security income and ha[s] significant debt."  [Doc. 49 at 6, ¶ 3(a)(1)]  Mr. Havel receives "1,067.00" per month in social security income.  [Doc. 15-1 at 31, ¶ 3]  Mr. Havel's social security income cannot be garnished.  42 U.S.C. § 407.

3.    Ms. Weaver has avowed under penalty of perjury that her "financial hardship" precluded her from "hir[ing] a Process Server" and that she is unable to "afford an attorney." [Doc. 14 at 1]  Ms. Weaver stated that in June 2022 she had "about $4,000 in [her] bank account" because Mr. "Havel took out a loan that he put in [Ms. Weaver's] bank account." [Doc. 14-1 at 32]  Ms. Weaver earns approximately "$1,512 per month" before deductions. [Doc. 14-1 at 31]  Ms. Weaver petitioned for Chapter 7 Bankruptcy on October 27, 2022.  A copy of Ms. Weaver's Petition for Bankruptcy is attached hereto as Exhibit B.  Ms. Weaver, through her Petition, swore that her monthly net income was "$20.65." [Exh. B at 40, ¶ 23(c)]

## 2.    The Harm Cannot Be Fully Rectified After Trial Because Defendants' Ongoing Distributions of the Protected Materials Intend to Continue Distributing the Protected Materials.

Defendants' misconduct at issue in this matter is irreparable and, as Defendants have admitted, has been intended to be irreparable.  *See* Sections II(C), (G)-(H) (identifying Defendants' multiple representations that confirm that Defendants seek to reveal and disseminate Plaintiff's protected materials and have others circulate the materials).

Even if monetary damages could be recovered from Defendants, monetary damages will not cure Plaintiff being stripped of its ability to control the materials at issue.  Defendants have distributed the materials to others whom Defendants have encouraged to re-distribute materials, rendering weaker Plaintiff's ability to re-gain control over the materials.

Plaintiff will not secure adequate relief absent the Court entering an Order that obligates Defendants to remove its publications/circulation of the materials, prohibits Defendants from further dissemination of the materials, and forces the return of the materials.   Even then, however, Plaintiff will need to remain hawkish to (1) prevent others from redistributing the materials that Defendants have published to the world, and (2) enforce its rights against those third parties, and Defendants if they violate the Court Order, which Defendants have stated that they will not respect.  *See* Sections II(C), (H).

**C.      There Is No Adequate Remedy at Law.**

"Prior cases in this circuit indicate that the irreparable harm and no adequate remedy at law inquiries are intertwined." *Lineback v. Frye Elec., Inc.*, 539 F. Supp. 2d 1111, 1121 (S.D. Ind. 2008).

As explained above, in Sections II(C), (H) and III(B)(1)(d), there is no adequate remedy at law because Defendants will not be able to satisfy an award of monetary damages and Defendants will continue to engage in unlawful actions.

This situation is similar to *Fitzgerald v. Murray*, in which the court found irreparable harm and an inadequate remedy at law when there was a "likelihood that [defendant] w[ould] continue infringing [plaintiff]'s copyright and that it will not be able to obtain money damages."  121CV01822TWPTAB, 2021 WL 7502265, at *5 (S.D. Ind. Oct. 20, 2021). Defendants, as set forth in Section II(C) and Section II(H), have avowed to continue infringing Plaintiff's copyrights and have a goal of having Plaintiff's protected materials redistributed. Further, as set forth in Section III(B)(1)(d), Plaintiff will not be able to recover monetary damages from Defendants.

Moreover, Plaintiff will continue to suffer from Defendants' ongoing misconduct that will not be curtailed unless there is a Court Order.  Defendants will continue to distribute Plaintiff's protected materials, which has resulted in irreparable harm because it has eliminated Plaintiff's ability to control the distribution of the materials and has the potential of further irreparable harm in the form of the loss of life, as has happened in the past. *See Whitaker By*

*Whitaker*, 858 F.3d 1034, 1046 ("While the [defendant] focuses the majority of its arguments on why [plaintiff]'s harm is not irreparable, it also argues that any harm he has allegedly suffered can be remedied by monetary damages. We are not convinced. While monetary damages are used to compensate plaintiffs in tort actions, in those situations the damages relate to a past event, where the harm was inflicted on the plaintiff through negligence or something comparable. But this case is not the typical tort action, as [plaintiff] has alleged prospective harm.").  Plaintiff's prospective harm cannot be remedied by monetary damages that will be unrecoverable.

Injunctive relief is necessary because the future harms that will arise from Defendants' avowals to continue circulating Plaintiff's copyrighted materials cannot be compensated by damages.

### D.    Defendants Will Not Be Harmed by the Court Entering a Preliminary Injunction.

Defendants will not be harmed by the Court enjoining Defendants' unlawful practices because it is not lawful for Defendants to infringe on the rights of others.  *See YOURNETDATING, LLC v.* Mitchell, 88 F. Supp. 2d 870, 872 (N.D. Ill. 2000) ("Mitchell and Webscapades will suffer no legitimate harm of which they can complain if the TRO is granted because they have no honest business hacking YourNetDating's system and diverting its customers to Sexetera.").

Even if Defendants were injured by an Order preventing Defendants from engaging in unlawful actions, such an injury would be the result of Defendants' wrongdoing.  *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm*., 290 F.3d 578, 596 (3d Cir. 2002) ("[T]he injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself.").

### E.    There Is a Strong Public Interest in Granting the Injunction.

The balance of harms works on a sliding scale such that "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to

win, the more need it weigh in his favor." *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018). Because Plaintiff is likely to prevail on its Copyright Claims, as the Court previously found, the balance of harms only needs to weigh slightly in the Foundation's favor.

It is well established that "upholding copyright protections serves the public interest" and "that copyright and trademark law protects not only individual parties, but the public at large." *Fitzgerald v. Murray*, 121CV01822TWPTAB, 2021 WL 7502265, at *5 (S.D. Ind. Oct. 20, 2021) (quoting *Silvertop Assocs. Inc. v. Kangaroo Mfg., Inc.*, 319 F. Supp. 3d 754, 770 (D.N.J. 2018)). Article I, Section 8, Clause 8 of the Constitution evidences the deeply rooted public policy to protect copyrights and intellectual property rights.

There is no interest that cuts in favor of Defendants. The law has made it unlawful to infringe upon the rights of others, as Defendants have done and continue to do without any regard for the law, and the Constitution provides rights to protect the owner of a copyright. Defendants have no intention of stopping, no matter the consequence, and it is proper for the Court to bring order to the chaos that Defendants have caused.

## IV. <u>FUTURE INJUNCTIVE RELIEF WILL BE SOUGHT AGAINST MS. WEAVER ONCE THE BANKRUPTCY STAY HAS BEEN LIFTED.</u>

This Motion seeks injunctive relief against Mr. Havel and Mr. Bartel only because Ms. Weaver petitioned for bankruptcy on October 27, 2022. Despite Ms. Weaver's failure to file in this action a Notice of Bankruptcy, there is nevertheless an automatic stay with respect to Plaintiff's Claims against Ms. Weaver in this proceeding. *See* 11 U.S.C. § 362.

Plaintiff will either (1) seek to lift the stay so that Plaintiff can proceed against Ms. Weaver in this action, or (2) Plaintiff will bring an adversary proceeding against Ms. Weaver, which will ask for injunctive relief. The Bankruptcy Trustee told Plaintiff's counsel that the Trustee will not oppose a Motion to Lift the Stay.

## V. <u>REQUEST FOR TRIAL ON THE MERITS IF THERE IS A HEARING.</u>

If the Court would benefit from having a hearing on this Motion, Plaintiff requests that the Court advance the trial on the merits, as authorized by Fed. R. Civ. P. 65(a)(2) and

consolidate it with a hearing.  In this case, given the overwhelming evidence of Defendants' misconduct, lengthy discovery is not necessary.

## VI.  <u>CONCLUSION</u>.

Plaintiff respectfully requests that the Court enter an Order that: (1) prohibits Mr. Havel and Mr. Bartel from infringing upon Plaintiff's copyrights, (2) requires Mr. Havel and Mr. Bartel to deliver copyrighted materials to Plaintiff's counsel, and (3) requires Mr. Havel and Mr. Bartel and/or various online platforms to take down certain accounts and webpages that contain Plaintiff's copyrighted materials.  Because the removal of such materials could result in the spoliation of evidence, Plaintiff requests the Court Order Defendants to back-up onto an external drive their computers, smartphones, and online accounts on which Defendants have uploaded materials, and to lodge those materials with the Court, under seal.

A proposed form of Order is being submitted herewith.

RESPECTFULLY SUBMITTED this 29th day of June 2023.

 /s/ Isaac S. Crum
MESSNER REEVES LLP
Isaac S. Crum (AZ Bar #026510) (*Pro Hac Vice*)
icrum@messner.com
Daniel L. Marks (AZ Bar #034141) (*Pro Hac Vice*)
dmarks@messner.com
7250 N. 16th Street, Suite 410
Phoenix, Arizona 85020
Telephone: (602) 641-6705
Facsimile: (303) 623-0552

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th day of June 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of the filing to the parties listed below.  A copy of this filing was also sent via U.S. mail and email.

Cathy Weaver
5776 Grape Road, Ste 51
PMB #121
Mishawaka, IN 46545
sawcat575@gmail.com

Cathy Weaver
███████████
███████████
sawcat575@gmail.com

Steven Robert Havel
5776 Grape Road, Ste 51
PMB #121
Mishawaka, IN 46545
sawcat575@gmail.com

Jason Bartel
N4019 Forest Drive
Hancock, WI 54943
jason_bartel@unioncab.com

_/s/ Mary Willson_