## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

THE EVOLUTIONARY LEVEL ABOVE
HUMAN FOUNDATION, INC.,

      Plaintiff,

        v.                        CASE NO. 3:22-CV-395-MGG

STEPHEN ROBERT HAVEL, et al.,

      Defendants.

### OPINION and ORDER

Pending and ripe before the Court are two Motions for Preliminary Injunction: the first filed by Plaintiff [DE 118] and the second filed by Defendant Steven Havel [DE 179]. Also ripe before the Court are three motions filed by the Defendants seeking to modify or strike Plaintiff's proposed preliminary injunction order. For the following reasons, the Court denies all the motions.[1]

### I.    Background

Throughout the 1980s and 1990s, a religious group known as Total Overcomers Anonymous or Heaven's Gate (hereinafter "the Group") created numerous works to disseminate its teachings. These works consisted of hundreds of audio tapes and video

---

[1] As discussed *infra*, the Court held a status conference on Plaintiff's Motion for Preliminary Injunction after Defendants' initial responses to the motion indicated that they agreed to cease their alleged infringing activity. During the status conference, Defendants agreed to a stipulated preliminary injunction order that would prohibit them from disseminating Plaintiff's works. The parties' agreement subsequently dissolved, though, after Plaintiff filed its proposed injunction order. Given the amount of briefing now before the Court, no further hearing is necessary on Plaintiff's motion. Likewise, no hearing is necessary on Mr. Havel's motion, as it is apparent from the allegations in his motion that he is not entitled to the preliminary relief he requests.

tapes, several literary works, and other visual works. The Group and its beliefs made national headlines in March of 1997 after thirty-nine members of the Group committed suicide in San Diego, California. The timing of the Group's death was intended to coincide with the approach of the Hale-Bopp Comet, as the Group believed that the comet signaled the window of opportunity for the Group to enter the Kingdom of Heaven. [DE 119 at 2; DE 119-1 at 47, Ex. 13].

After the Group's death, their estates were consolidated and administered through Summary Probate Proceedings. [DE 81-1 at 9]. The Public Administrator for the County of San Diego served as the personal representative for the Group's estates. Plaintiff intervened in these proceedings, and later acquired rights to the Group's intellectual property. Plaintiff then filed this case on May 18, 2022, alleging that *pro se* Defendants Steven Havel, Cathy Weaver, and Jason Bartel have committed acts that infringe on their intellectual property rights. Plaintiff has presented the following copyright and trademark registrations: copyright registration no. SRu00298530, for 486 of the Group's audio recordings ("the Audio Works"); Reg. Nos. PA0000867224, for the Group's video tapes; no. VA000877834, for the Group's lithograph prints, including artwork entitled "The C.B.E. (Celestial Being Entity)"; TXu 000817732 for the Group's book titled "How and when 'Heaven's gate' (the door to the physical kingdom level above human) may be entered: an anthology of our materials"; and trademark registrations 3824482, 3816596, and 5148959, for the Group's word marks. [DE 132-1, through DE 132-7]. Plaintiff explains that, although it owns all intellectual property

rights for the Group's works, there are other works created by the Group that it has not registered with the U.S. Copyright Office.

Plaintiff has moved for a preliminary injunction that prohibits Defendants[2] from infringing on Plaintiff's registered copyrights while this case is pending.[3] Plaintiff also indicated that no additional discovery was necessary in this case and that, if a hearing was held on its motion, such hearing could be consolidated with the trial on the merits. Plaintiff's motion also requested an order requiring Defendants to deliver copies of any copyrighted material in their possession to Plaintiff's counsel and to remove any copyrighted materials from their online accounts and webpages.

Plaintiff's motion prompted a flurry of filings from the Defendants. Through these filings, Defendants dispute that Plaintiff met the required showings for a preliminary injunction and dispute that Plaintiff owns valid copyrights and trademarks on the Group's works. Defendants also vehemently opposed Plaintiff's position that no further discovery was necessary in this case. Significantly, despite the Defendants' objections to the preliminary injunction, Defendants conceded that they had performed the acts alleged and explained that they had ceased any alleged infringing activity pending resolution of this case. [See, e.g., DE 20 at 21, ¶¶ 46, 60, 64; DE 87 at 23; DE 26 at 13, ¶ 48; DE 74 at 5; and DE 35, ¶ 28]. Defendants also reported that additional discovery was crucial to their theories of the case.

---

[2] Plaintiff's motion does not include a request for preliminary relief against Ms. Weaver due to her bankruptcy filing. Ms. Weaver did participate in briefing on Plaintiff's motion and even agreed to a stipulated preliminary injunction. Thus, though the motion does not seek relief from Ms. Weaver, the Court will discuss her participation in the motion as appropriate.

[3] Plaintiff's complaint also alleges that Defendants have infringed on its registered trademarks [DE 132-3, DE 132-4, DE 132-5]. But Plaintiff does not include these claims in its request for preliminary relief.

Based on these responses, the Court held a zoom hearing with the parties on June 14, 2023, to determine whether the parties could reach an agreement regarding a preliminary injunction order so that a scheduling order could be entered, and the case could then proceed towards final resolution. During the hearing, Defendants again agreed to cease the alleged infringing activity. Defendants also agreed to be bound by a preliminary injunction order so long as any stipulated injunction order did not require Defendants to admit to Plaintiff's allegations and so long as Plaintiff provided Defendants with a list of the 486 audio works included in copyright registration SRu298530. [*See* DE 117 at 2].

To facilitate the parties' agreement and propel the case forward, the Court ordered Plaintiff to draft and file a proposed preliminary injunction order and to provide two lists of works to the Defendants: one list of the 486 audio works included in copyright registration SRu298530 and the other list of Plaintiff's audio works not registered under this copyright. During the hearing, Ms. Weaver also requested that the Court strike her home address from Plaintiff's preliminary injunction motion. Plaintiff was accordingly ordered to file a redacted motion for preliminary injunction that did not reveal Ms. Weaver's home address.

Plaintiff filed its redacted motion for preliminary injunction on June 29, 2023.[4] Plaintiff also timely filed a proposed preliminary injunction order and lists of works on June 30, 2023. Though these filings were intended to facilitate the parties' agreement

---

[4] After Plaintiff filed its redacted motion, the Court denied its prior motion for preliminary injunction as moot.

from the status conference, the filings instead prompted a renewed impasse. At the outset, Plaintiff's proposed preliminary injunction order and lists of works [DE 120] did not suggest that the parties had reached an agreement about an injunction order and was drafted accordingly. Unsurprisingly, each Defendant objected to Plaintiff's proposed order. First, Mr. Havel and Ms. Weaver both filed Motions to Modify Plaintiff's "Proposed" Order for Preliminary Injunction on July 5, 2023. [DE 121, DE 122]. Through their motions, Mr. Havel and Ms. Weaver maintain that Plaintiff's proposed order does not reflect the parties' agreement at the status conference and that they cannot agree to a preliminary injunction order as proposed by Plaintiff. Mr. Havel also challenges Plaintiff's list of audio works contending that Plaintiff replaced the Group's detailed description of the works with the generic title "Various Discussions" such that he cannot ascertain which videos are included under this copyright. [DE 121 at 2, ¶1]. Mr. Bartel also filed a motion in response on July 10, 2023. Although Mr. Bartel's motion primarily objected to the caption used in this case—concerns which were addressed via separate order—Mr. Bartel also objected to the descriptions Plaintiff used in its lists of works. [*See* DE 124 at 10-12]. Mr. Bartel later filed a Motion to Strike Plaintiff's Redacted Proposed Order for a Preliminary Injunction on October 2, 2023. [DE 162].

Due to the parties' renewed impasse, the Court issued an order on July 12, 2023, setting briefing deadlines on the Defendants' motions. Recognizing that the parties were now unable to agree to the parameters of a preliminary injunction order, the Court also advised that "[u]pon review of the parties' arguments regarding the parameters of

a preliminary injunction order, the Court will enter such an order as deemed appropriate." [DE 125 at 3].

But before the Court could rule on these motions, Mr. Havel filed his own Motion for Preliminary Injunction on November 20, 2023. Mr. Havel seeks to enjoin Plaintiff from filing additional copyright or trademark registrations on the Group's works until this case is resolved. In response, Plaintiff maintains that Mr. Havel's motion falls short of the threshold requirements for a preliminary injunction and that the unregistered works are outside the scope of this case. Nonetheless, Plaintiff also stated that it would delay applying for any new registrations until this case is resolved so long as case management deadlines are not further extended.

The Court may rule on these motions based the parties' consent to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c). [DE 41].

## II.    Legal Standard

Federal Rule of Civil Procedure 65 permits the Court to issue a preliminary injunction to preserve the parties' respective positions until final judgment is entered. But "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (internal citations omitted). Rather, as "an extraordinary and drastic remedy, [a preliminary injunction] should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original).

Obtaining a preliminary injunction involves a two-step inquiry. First, the moving party must demonstrate certain threshold showings: (1) he has a reasonable likelihood

of success on the merits; (2) he has no adequate remedy at law; and (3) he will suffer irreparable harm absent the injunction. *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012). If the moving party fails to demonstrate any of these threshold showings, the court must deny the request for injunctive relief. *Id.*

If the threshold showings are met, the court moves to the second step of the inquiry and "exercise[s] its discretion to determine whether the balance of harms weighs in favor of the moving party or whether the nonmoving party or public interest will be harmed sufficiently such that the injunction should be denied." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). Thus, if a moving party shows that it is likely to prevail on the merits, the balance of harms need not weigh as heavily in its favor. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018).

"The court may deny [a movant's] request for a preliminary injunction without a hearing if it concludes as a matter of law that [the movant's] allegations, even if proven, are insufficient to support the issuance of a preliminary injunction." *Piekosz-Murphy v. Bd. of Educ. of Cmty. High Sch. Dist. No. 230*, 858 F. Supp. 2d 952, 961–62 (N.D. Ill. 2012) (internal citations omitted). Conversely, if the Court finds that an injunction should issue, the moving party must "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court's order granting injunctive relief must also include the following contents: first, the reasons why the injunction was issued; second, the injunction's terms, stated specifically; and third, a

description of the acts or acts restrained or required in reasonable detail (and not by referring to the complaint or other document). *See* Fed. R. Civ. P. 65(d).

## III.   Discussion

At the outset, the Court must address mootness. As stated, in response to Plaintiff's motion, Defendants agreed to cease their alleged infringing activity (although they did not agree to the specific injunction order proposed by Plaintiff). Likewise, in response to Defendant Havel's motion, Plaintiff has agreed to delay future registrations. But neither agreement, by itself, renders the motions moot. Rather, the "standard for mootness" for injunctive relief is whether there is "no reasonable expectation that the alleged wrong will be repeated." *Lucini Italia Co. v. Grappolini*, 288 F.3d 1035, 1038 (7th Cir. 2002). Courts have routinely found that a party's agreement to cease certain activity is not sufficient to render a motion for injunctive relief moot. *See id.* (observing that "a request for an injunction, preliminary or otherwise, simply is not mooted because the parties have, for the course of the litigation and by their own agreement, maintained the status quo"); *see also Silver Streak Indus., LLC v. Squire Boone Caverns, Inc.*, No. 4:13-CV-00173-RLY, 2014 WL 220682, at *5 (S.D. Ind. Jan. 21, 2014) ("The voluntary cessation of an allegedly illegal activity does not automatically make the issue moot, because the party may begin the activity again.").

Moreover, even if an agreement was sufficient to moot a request for preliminary relief, the Court cannot find that such agreements continue to exist here. First, though Defendants agreed to cease the alleged infringing activity, Plaintiff's proposed order filed after the Court's June 2023 status conference did not reference the parties' oral

stipulation (or suggest that any sort of stipulation had been reached) and requested relief beyond what Defendants agreed to. All three Defendants have filed motions objecting to the proposed order filed by Plaintiffs. Indeed, Mr. Havel has denied most of Plaintiff's allegations in the proposed order [DE 121-1 at 2, ¶1] and Ms. Weaver states that she can no longer agree to a preliminary injunction with Plaintiff's proposed order. [DE 122-1 at 1]. Thus, the Court can only assume that the parties are at another impasse such that the Court must consider Plaintiff's motion and proposed order in full.

Next, although Plaintiff agreed to refrain from registering additional copyrights or trademarks on the Group's works, its agreement was contingent on the Court maintaining existing case management deadlines. These deadlines have now been tolled pending the Court's ruling on the parties' motions. [*See* DE 189]. Regardless of the Court's order tolling deadlines, it does not appear that Defendants would be willing to accept this voluntary offer. For instance, Defendant Havel's reply indicates that he "doesn't trust Plaintiff[] would informally agree to not file any further copyrights or trademarks" absent an order from the Court enjoining Plaintiff from doing so. [DE 190 at 11, ¶6]. Thus, the Court must also consider Mr. Havel's motion in full.

The Court now addresses each motion in turn.

### A.    Plaintiff's Motion for Preliminary Injunction

Plaintiff has filed for a preliminary injunction that requests the following preliminary relief:

> 1) Defendants, including Defendants' agents and/or other persons in concert or participation with Defendants, are restrained from: a. Copying, reproducing, displaying, distributing, performing, or preparing derivative works of any of the Copyrighted Works; and b. Aiding, abetting,

contributing to, or otherwise assisting anyone in infringing upon the Copyrighted Works.

2) Within four (4) calendar days of the date of this Order, Defendants are obligated to collect and deliver to the Foundation's counsel all copies in their possession, custody, or control of: a. Audio tapes and recordings registered with the Copyright office as SRu00298530; b. Audiovisual recordings registered with the Copyright office as PA00667224; c. Literary works registered with the Copyright office as TXu00817732; d. Visual works registered with the Copyright office as VA00877834; and e. the Unregistered Works.

3) Within four (4) calendar days of the date of this Order, Defendants are obligated to remove and delete from the internet any and all posting that they have control over which contain Plaintiff's Copyrighted Works. This includes, but is not limited to, the following websites: Alphabet Inc. and its subsidiary, Google LLC, Automattic Inc. d/b/a Wordpress, Meta Platforms Inc. f/k/a Facebook, Inc., Twitter, Inc., and Archive.org.

4) Within four (4) calendar days of the date of this Order, Defendants are obligated to remove and delete from the internet https://heavensgatealso.com/. Defendants are obligated to preserve all data regarding the publishing of https://heavensgatealso.com, internet traffic to https://heavensgatealso.com/, and emails sent to "rep@heavensgatealso.com".

[DE 120].

As stated, to obtain the requested preliminary injunction, Plaintiff must first demonstrate that: (1) it has a reasonable likelihood of success on the merits; (2) it has no adequate remedy at law; and (3) it will suffer irreparable harm absent the injunction. *Planned Parenthood of Ind., Inc.*, 699 F.3d at 972.

### 1.   Likelihood of Success on the Merits

The Court starts with whether Plaintiff has shown a reasonable likelihood of success on the merits. While this does not require Plaintiff to "show that [it] definitely will win the case," *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020), "a mere possibility of success is not enough." *Id.* at 762. Thus, "[a] strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* at 763 (quotation marks omitted). In assessing the merits, the court does not simply "accept [the moving party's] allegations as true, nor do[es] [it]

give him the benefit of all reasonable inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022). Instead, the Court must assess the merits as "they are likely to be decided after more complete discovery and litigation." *Id.*

Plaintiff seeks to enjoin Defendants' actions as to its copyrighted works, so the Court will consider the merits of Plaintiff's copyright infringement claims. The elements of a copyright infringement claim are "(1) ownership of a valid copyright, and (2) copying of the constituent elements of the work that are original." *Design Basics, LLC v. Signature Construction, Inc.*, 994 F.3d 879, 886 (7th Cir. 2021) (citation omitted).

The Court starts with the second element because it is generally undisputed. Copying can be shown by direct and indirect evidence. Direct evidence includes "party admissions, witness accounts of the physical act of copying, and common errors in the works." *Fitzgerald v. Murray*, No. 121CV01822TWPTAB, 2021 WL 7502265, at *4 (S.D. Ind. Oct. 20, 2021)(quoting *Rottlund Co. v. Pinnacle Corp.*, 452 F.3d 726, 732 (8th Cir. 2006)).  Here, there is direct evidence of copying—Defendants concede that they engaged in the alleged infringing activity in their filings submitted to the Court. For instance, Mr. Havel has stated in his filings that he has "shar[ed] [the Group's] information with people who seek it out," that he has played the Group's audio tapes on his YouTube channel for some time, and that he sent copies of copyrighted works to Defendant Bartel. [DE 87 at 1, ¶1; DE 20 at 18, ¶40; DE 20 at 12-13, ¶¶35-36]. Likewise, Ms. Weaver explains that she participated in online videos or "live streams" where the Group's works were displayed and that these videos have now been marked as

11

"private". [DE 39-1 at 23; DE 74 at 5]. Ms. Weaver also states that she does "not deny that we sold 9 shirts . . . that contain what [Plaintiff] state[s] they have copyrighted." [DE 74 at 9, ¶10]. Mr. Bartel has also confirmed that he disseminated the Group's work by placing it online sharing websites. [DE 35 at 12, ¶27; 13-14 at ¶¶29-31, 51-52 at ¶132]. Thus, the second element of Plaintiff's copyright infringement claim is undeniably met.

Mr. Havel's response does assert, though, that his use of the works is considered fair use. The Copyright Act does provide that "the fair use of a copyrighted work, . . . for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research, is not an infringement of a copyright." 17 U.S.C. § 107. To determine whether a particular use of a work is "fair," courts consider four factors, which "set forth general principles, the application of which requires judicial balancing, depending upon relevant circumstances." *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1197, 209 L. Ed. 2d 311 (2021). The four factors are:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

Fair use is considered an affirmative defense, so it is Mr. Havel's burden to prove on a dispositive motion or at trial. *Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 629 (7th

Cir. 2003). However, here, "the court emphasizes that it need only determine [the defense's] potential success in terms of a preliminary injunction, *i.e.,* whether there is a reasonable likelihood that [Plaintiff] can prevail notwithstanding the[] defense[]." *Ty, Inc. v. W. Highland Pub., Inc.,* No. 98 C 4091, 1998 WL 698922, at *9 (N.D. Ill. Oct. 5, 1998).

Turning to the substance of Mr. Havel's arguments, he contends that his use of the Group's works constitutes fair use because the works were "used by [him] and provided to people who asked for it, and were broadcast parts of over my livestreams without monetary gain on my part. My YouTube channel has never been monetized. . .. My usage was strictly educational, scholarly, and for research purposes." [DE 163 at 105-6; DE 87 at 12]. But other than these conclusory statements that his use meets the purposes covered in the first factor, Mr. Havel does not address the remaining factors listed in 17 U.S.C. § 107 or otherwise explain how his use constitutes fair use. Conclusory, unsupported arguments like this are deemed waived. *United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir. 1992). Moreover, Plaintiff has contended—and Mr. Havel has conceded—that he has disseminated certain works in their entirety. Such wholesale copying, without any distinct purpose from the original, typically weighs against a finding of fair use. *See Ty, Inc. v. Publications Int'l Ltd.,* 292 F.3d 512, 517 (7th Cir. 2002) ("[C]opying that is a substitute for the copyrighted work . . . is not fair use.") (internal citations omitted). Without more from Mr. Havel, his fair use arguments fail to demonstrate that Plaintiff does not have a reasonable likelihood of success on the merits as to the second element of its copyright infringement claims.

The Court now considers the first element of Plaintiff's claims—ownership of valid copyrights. Plaintiff has submitted four certificates of registration from the United States Copyright Office: (1) "The Audiotape Library of Heaven's Gate by Ti and Do," under copyright registration SRu298530; (2) "Beyond Human – The Last Call," under copyright registration PA867224; (3) "The C.B.E. (Celestial Being Entity)," under copyright registration VA 877834; and (4) "How and When 'Heaven's Gate' (the Door to the Physical Kingdom Level Above Human) may be Entered – an Anthology of Our Materials," under copyright registration TXu817-732. [*See* DEs 132-1, 132-2, 132-6, and 132-7]. Plaintiff has also presented a signed declaration from its President, Mark King, explaining that Plaintiff acquired Group's intellectual property rights in 1999 after litigation. [DE 67-1 at 6, ¶8; DE 119-1 at 6, ¶8[5]].

Under the Copyright Act, a certificate of registration made within five years after first publication constitutes prima facie evidence of the validity of a copyright in a judicial proceeding. 17 U.S.C. § 410(c). But when a certificate of registration is made more than five years after publication, "[t]he evidentiary weight to be accorded to the certificate of registration shall be within the discretion of the court." *Id.* Here, one work— "The C.B.E. (Celestial Being Entity)," under copyright registration VA 877834 [DE 132-6]— was registered within this five-year time frame. Another work--"Beyond Human – The Last Call," registered under PA867224, was published shortly outside the five-year time frame. [*See* DE 132-2]. The other works do not list publication dates. [*See*

---

[5] Certain exhibits attached Plaintiff's redacted motion for preliminary injunction became illegible due to the way Plaintiff refiled the motion. Thus, the Court cites both to Plaintiff's original motion for preliminary injunction and redacted motion as necessary to ensure clarity.

DE 132-1; DE 132-7]. The Court notes, though, that while the Copyright Act does not mandate a presumption of validity for registrations obtained beyond the five-year timeframe, courts can still treat registrations outside this timeframe as prima facie evidence of ownership of a valid copyright. *See Southall v. Force Partners, LLC*, No. 1:20-CV-03223, 2021 WL 3883082, at *3 (N.D. Ill. Aug. 31, 2021)(stating that "the statute does not *forbid* a presumption of validity for post-five-year-certificates); *see also Graphic Design Mktg., Inc. v. Xtreme Enterprises, Inc.*, 772 F. Supp. 2d 1029, 1033 (E.D. Wisc. 2011) (finding the plaintiff's copyrighted work to be prima facie evidence of a valid copyright even though it was obtained ten years after first publication). But Defendants contend that Plaintiff's registrations should not be given any weight, explaining that there is no evidence suggesting that the Group transferred its intellectual property rights to Plaintiff prior to obtaining these registrations. Without any such documentation, Defendants contend that Plaintiff must have obtained these registrations fraudulently.

Copyright ownership can be transferred "in whole or in part by any means of conveyance or by operation of law." 17 U.S.C. § 201(d). Courts have found that, except for a transfer by operation of law: "[a] transfer of copyright ownership . . . is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." *Billy-Bob Teeth, Inc. v. Novelty, Inc.*, 329 F.3d 586, 591 (7th Cir. 2003). The Copyright Act does not define transfers by operation of law. But courts have found that such transfers occur in circumstances such as "transfers by bequest, bankruptcy, mortgage foreclosures, and the like." *Taylor Corp. v. Four Seasons Greetings*, LLC, 403

F.3d 958, 963 (8th Cir. 2005) (citing *Brooks v. Bates,* 781 F. Supp. 202, 205 (S.D.N.Y.1991));

*see also Software For Moving, Inc. v. La Rosa Del Monte Exp., Inc.,* No. 07 C 1839, 2007 WL

4365363, at *3 (N.D. Ill. Dec. 7, 2007) (relying on the court's analysis in *Brooks*). To

determine whether a copyright was transferred by operation of law, courts look to

"whether the author of the transfer provided express or implied consent to such change

of ownership." *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 41

(1st Cir. 2012).

     As stated, Defendants challenge the alleged transfer of ownership to Plaintiff

explaining that Plaintiff has failed to present any documents showing that the Group

transferred its intellectual property interests to Plaintiff. [DE 121-1 at 15, ¶11]. Without

such documentation, Defendants maintain that Plaintiff did not have an ownership

interest in the Group's works when Plaintiff registered them, making these registrations

invalid. In support of their argument, Defendants direct this Court to the Group's

probate proceedings—specifically, a decision reached on February 22, 1999, in the

California Superior Court for the County of San Diego (hereinafter "the California

Court"). [*See* DE 63-1 and 81-1, *in re Estates of John Michael Craig, et al.*, No. PN022228

(Cal. Super. Ct. Feb. 22, 1999)][6]. As part of these proceedings, the California Court

resolved asset distribution disputes between Plaintiff and the Public of Administrator of

the County of San Diego, who was serving as the personal representative of the

deceased Group members' estates. The California Court observed that there was no

---

[6] The Court can take judicial notice of a decision from another court. *Opoka v. I.N.S.*, 94 F.3d 392, 394 (7th Cir. 1996) ("Indeed, it is a well-settled principle that the decision of another court or agency, including the decision of an administrative law judge, is a proper subject of judicial notice.")

writing signed by the deceased Group members that conveyed ownership of the

Group's intellectual property to Plaintiff. Without such evidence, the California Court

found that the Group's intellectual property remained vested in the decreased Group

members' estates:

> Although [Plaintiff] presented evidence of post-mortem registrations of
> the [works] . . .. there is no evidence of any writing which explicitly
> conveyed or transferred ownership of all this intellectual property to the
> [Plaintiff]. . .. Therefore, there is no evidence that a pre-mortem transfer of
> the intellectual property rights occurred. Since there is no written
> instrument transferring ownership of the intellectual property to the
> [Plaintiff], the estates own all intellectual property as tenants in common.

[DE 63-1 at 7, ¶3; DE 81-1 at 12, ¶3.] Thus, as contended by Defendants here, the

California Court's decision provides that the Group's estates—not Plaintiff—had

ownership over the Group's intellectual property rights. Though this decision mirrors

the arguments made by Defendants here, their reliance on this decision is surprising, as

both Plaintiff *and* the Defendants have presented the Court with an Order Approving

Settlement Agreement entered by the California Court approximately six months later,

on August 11, 1999, after Plaintiff appealed the February decision. [*See* DE 63-1 at 13-24;

DE 81-1 at 7-16, *in re Estates of John Michael Craig, et al.*, No. PN022228 (Cal. Super. Ct.

Aug. 11, 1999)]. This order shows that Plaintiff and the Public Administrator

subsequently reached an agreement regarding the disposition of the Group's

intellectual property:

> Don Billings, Public Administrator . . . hereby agrees to transfer and
> convey to the [Plaintiff] by through and Mark King and Sarah King all
> right, title, and possession, of the following property, including any
> intellectual property rights . . .. [T]he [Plaintiff] promises to safeguard,
> archive and control these items thereby agreeing not to sell them.

17

[DE 63-1 at 17; DE 81-1 at 22]. The agreement also provides that "[t]he parties agree that this Agreement shall be binding on all the successors, heirs, administrators, assigns of each of the parties and the beneficiaries of their respective estates." [*Id.*]. The Court then approved the agreement "as to its form and content" and held that "the Parties may execute its terms forthwith." [DE 63-1 at 24; DE 81-1 at 29].

Thus, despite what Defendants contend, evidence presented by both parties demonstrates that the Group's intellectual property rights were transferred to Plaintiff by operation of law, through the Public Administrator's voluntary transfer of intellectual property rights to Plaintiff as part of a settlement agreement approved by the California Court. *See Taylor Corp.*, 403 F.3d at 964 (holding that a bankruptcy court order approving an asset purchase agreement transferring intellectual property rights constituted transfer by operation of law)[7].

Defendants expressly acknowledge Plaintiff's settlement with the Public Administrator but dispute its significance for two reasons. Both arguments appear to stem from Defendants' misunderstanding of the law. First, Defendants maintain that the California settlement agreement does not rectify the lack of evidence transferring ownership to Plaintiff at the time of registration and that Plaintiff must have misrepresented information to the Copyright Office at the time of registration. But

---

[7]Plaintiff has also submitted a Consent Decree entered on July 9, 1999, in case no. cv-98-00892 CRB ENE, The Evolutionary Level Above Human, Inc. dba The Telah Foundation, et al. v. Right to Know, the Executor of the Estate of Charles Humphrey aka Chuck Humphrey, et al. There, Plaintiff similarly alleged that the defendants infringed on its registered trademarks and copyrights. In that case, Plaintiff and the defendants also reached settlement agreement stating that Plaintiff has exclusive intellectual property rights over the Group's works. [DE 81-1 at 33, ¶8].

Defendants do not reference any authority or evidence to support this conclusory assertion of fraud, so the Court can only find it waived at this time[8]. Defendants also maintain that the settlement agreement does not apply to the specific works in their physical possession. Defendants explain that they received certain works directly from other former Group members before the settlement agreement was approved. Thus, according to Defendants, the works in their physical possession were not part of the settlement agreement, and, consequently, their copies of the works are all outside the scope of Plaintiff's intellectual property rights and registered copyrights. But 17 U.S.C. § 202 explains that ownership of a copyright is distinct from ownership of the material object itself:

> Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object.

Defendants do cite 17 U.S.C. § 202 in their filings, suggesting that it means Plaintiff's copyrights and intellectual property rights do not extend to the works in their possession. But Defendants' argument attempts to flip this statutory provision on its head. Here, Plaintiff has presented evidence that its intellectual property rights over the Group's works were conveyed to it as part of a court-approved settlement agreement.

---

[8] The Court acknowledges that Defendants have stated they need additional discovery to support these arguments, but at this time, the Court cannot base its decision on their mere allegations.

Thus, without evidence from Mr. Havel that the transfer of physical works to him also transferred intellectual property rights, the Court can only find that Plaintiff's intellectual property rights includes the Group's works that are currently in the Defendants' physical possession.

Mr. Havel also raises two additional affirmative defenses to Plaintiff's claims in his response to the Motion for Preliminary Injunction. He alleges that Plaintiff had "over 10 years to show [Defendants] the copyrights they had and did not" so Defendants' claims are barred by the affirmative defense of laches and delay. [DE 87 at 12; DE 121-1 at 13]. But beyond this conclusory statement, Mr. Havel fails to develop his arguments on these affirmative defenses. As such, the Court can only find that these arguments are also waived at this time.

Based on the foregoing, the Court now finds that Plaintiff has also shown a likelihood of success on the merits as to the first element of its copyright infringement claims—that it owns valid copyrights over the allegedly infringed works. Thus, Plaintiff has met its burden on the first prong for a preliminary injunction.

### 2.      No Adequate Remedy at Law/Irreparable Harm

The next inquiry is whether Plaintiff has shown that it has no adequate remedy at law and that, absent entry of a preliminary injunction, it will suffer irreparable harm. "Harm is irreparable if legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.,* 8 F.4th 531, 545 (7th Cir. 2021). But this "does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." *Id.*;

*see also Orr v. Shicker,* 953 F.3d 490, 502 (7th Cir. 2020) (finding that irreparable harm is "harm that 'cannot be repaired' and for which money compensation is inadequate"). The harm need not actually occur before the court can grant relief on the merits, but a movant must still show more than just a mere possibility of irreparable harm. *Michigan v. U.S. Army Corps of Eng'rs,* 667 F.3d 765, 787-8 (7th Cir. 2011).

"Prior cases in this circuit indicate that the irreparable harm and no adequate remedy at law inquiries are intertwined." *Lineback v. Frye Elec., Inc.,* 539 F. Supp. 2d 1111, 1121 (S.D. Ind. 2008). Here, Plaintiff's arguments intertwine the inquiries—alleging that, for multiple reasons, it will incur harm that cannot be repaired and that monetary damages are not sufficient. Thus, consistent with Plaintiff's arguments, the Court will address the substance of each argument as it pertains to the two inquiries.

### a. Potential Loss of Life

The Court first addresses Plaintiff's argument that it will suffer irreparable harm absent a preliminary injunction because the Defendants' distribution of the Group's materials could result in the loss of life. [DE 119 at 19]. Plaintiff explains that the powerful message contained in the Group's materials could lead to suicide, "as evidenced by nearly all [the Group's] members committing mass suicide based on the message of Heaven's Gate." [DE 119 at 16, 19]. Thus, Plaintiff maintains that Defendants' dissemination of the Group's materials could cause the mass suicide from 1997 to reoccur, which cannot be redressed by monetary damages. [DE 119 at 19]. In support, Plaintiff directs this Court to *Whitaker* by *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. Of Educ.,* 858 F.3d 1034, 1046 (7th Cir. 2017).

In *Whitaker*, a transgender high school student challenged his school's policy barring him from using the men's restroom after he had started his transition from female to male. With the next school year approaching, the plaintiff moved for a preliminary injunction enjoining the school from enforcing its bathroom policy, alleging that the policy caused him to contemplate suicide and exacerbated other physical ailments. *Id.* at 1039. The district court granted the plaintiff's request, which the school appealed. On appeal, the Seventh Circuit affirmed, finding that the irreparable harm alleged by the plaintiff—the risk of suicide—was "well-documented and supported by the record." *Id.* at 1039. For instance, the Seventh Circuit observed that the plaintiff had presented expert opinions supporting his allegations that the school's policy regarding his bathroom access was "directly causing significant psychological distress" and that, as a result, the plaintiff was "at risk for experiencing life-long diminished well-being and life-functioning." *Id.* at 1045-46. The Seventh Circuit also dismissed the school's allegations that the plaintiff could be adequately compensated by monetary damages, explaining that the plaintiff had demonstrated a "*prospective* harm", which monetary damages would not be able to rectify at final judgment. *Id.* at 1046 (emphasis in original).

As stated, Plaintiff also asserts that Defendants' actions create a prospective harm—that their actions will cause the events of 1997 to reoccur. While this Court takes such assertions very seriously; the Court simply cannot find that Plaintiff's assertions are supported to the level of suicide risk discussed in *Whitaker*. As stated, the court in *Whitaker* found that preliminary relief was warranted because the plaintiff had

demonstrated a *prospective* risk of suicide, which was "credited by the expert opinion" submitted with the motion. *Id.* But here, Plaintiff primarily supports its arguments by referring to a singular event in the past—the Group's mass suicide in 1997. Plaintiff does state that four others have similarly taken their lives since that time; however, Plaintiff does not provide the Court with any evidence—such as the specific circumstances or timing of these deaths—to explain how these deaths support a reoccurrence of the events in 1997. Moreover, Defendants dispute Plaintiff's claims, maintaining that they do not promote suicide when spreading the Group's teachings and have posted disclaimers to this effect on their social media pages and websites. [DE 87 at 3]. Defendants also dispute Plaintiff's assertion that the four deaths that occurred after 1997 show that "history repeated itself." [DE 119 at 19, DE 87 at 3]. Rather, Defendants state that these deaths were also of former Group members, with the most recent of these deaths occurring 24 years ago. [DE 87 at 3]. Regardless of Defendant's assertions, though, without more from Plaintiff, the Court cannot find that Plaintiff's sweeping reference to the Group's actions nearly thirty years ago is a "well-documented" prospective harm like the one asserted in *Whitaker. Id.* at 1039; *see also Univ. of S. Indiana*, 43 F.4th at 791 (stating the Court does not simply "accept [the moving party's] allegations as true, nor do[es] [it] give him the benefit of all reasonable inferences in his favor").

Moreover, other evidence presented by Plaintiff in support of its motion demonstrates that Plaintiff itself maintains a website that disseminates some of the Group's teachings—including the Group's specific beliefs that culminated in the mass

suicide in 1997. Plaintiff has included a screenshot of a website it maintains on behalf of the Group (https://heavensgate.com) as an exhibit to its motion for preliminary injunction. [DE 67-1 at 47; DE 119-1 at 47]. This webpage is titled "Red Alert: HALE-BOPP Brings Closure to Heaven's Gate." [*Id.*] The webpage then states:

> The *joy* is that our Older Member in the Evolutionary Level Above Human (the "Kingdom of Heaven") has made it clear to us that Hale-Bopp's approach is the "marker" we've been waiting for—the time for the arrival of the spacecraft from the Level Above Human to take us home to "Their World"—the literal heavens. Our 22 years of classroom here on planet Earth is finally coming to conclusion – "graduation" from the Human Evolutionary Level. We are happily prepared to leave "this world" and go with Ti's crew.
> If you study the material on this website, you will hopefully understand our job and what our purpose here on Earth has been. You may even find your "boarding pass" to leave with us during this brief "window."

[DE 67-1 at 47; DE 119-1 at 47].

This evidence undermines Plaintiff's arguments here for two reasons. First, although Plaintiff does state that it has only disseminated the materials in a limited fashion [*see* DE 119 at 18], Plaintiff's motion fails to explain why Defendants' dissemination of the Group's materials creates the prospective risk of suicide, but its own dissemination does not. Accordingly, Plaintiff fails to explain how a preliminary injunction enjoining only Defendants' dissemination will prevent this irreparable harm.

Moreover, Plaintiff's own website shows that, while the Group did promote suicide—and that it did so believing that it would take its members to heaven—the Group's message emphasized that the Group only had a "brief 'window'" to do so. [DE 119-1 at 47]. Plaintiff's website also explains that the Group believed that their "window" was demarcated by the approach of the Hale-Bopp comet, which is not predicted to approach the Earth again for thousands of years, with most predications

24

stating that it will return around the year 4385.[9] No other evidence presented by

Plaintiff shows a universal promotion of suicide suggesting that, absent preliminary

relief,  Defendant's dissemination of the Group's materials results in a *prospective* harm.

Thus, without more, the Court cannot find that Plaintiff's arguments regarding

the potential loss of life demonstrate, by a clear showing, that it has no adequate

remedy at law and will suffer irreparable harm absent preliminary relief. *Mazurek*, 520

U.S. at 972.

### b. Insufficiency of Money Damages

As stated, "[a]n injury compensable in money is not 'irreparable', so an

injunction is unavailable." *Classic Components Supply, Inc. v. Mitsubishi Elecs. Am., Inc.*,

841 F.2d 163, 164–65 (7th Cir. 1988). But courts have found that certain monetary losses

may constitute irreparable harm when:

> (1) the plaintiff is so poor that he would be harmed in the interim by the loss of the monetary benefits; (2) the plaintiff would be unable to finance his lawsuit without the money he wishes to recover; (3) the damages would be unobtainable from the defendant because it will be insolvent prior to the final judgment; and (4) the nature of the plaintiff's loss may make damages very difficult to calculate.

*Hamlyn v. Rock Island Cnty. Metro. Mass Transit Dist.*, 960 F. Supp. 160, 162 (C.D. Ill.

1997). Plaintiff contends that these circumstances apply here, warranting the

preliminary relief requested.

Regarding the first and second circumstances, Plaintiff presents an affidavit from

its director, Mark King, explaining that it will not be able to continue to prosecute this

---

[9] Courts may take judicial notice of public records, historical events, scientific facts, and facts from governmental agencies. *See Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997); *Menominee Indian Tribe of Wisconsin v. Thompson*, 161 F.3d 449, 456 (7th Cir.1998).

case absent this preliminary relief because it is a not-for-profit organization that generates only *de minimus* revenue. As such, the costs of this case have already exceeded its typical operating expenses and are not sustainable. [*See* DE 119 at 17]. Plaintiff further explains that it has maintained its existence over the last 25 years because its directors have contributed personal funds. In support, Plaintiff first points to the expense of filing this case ($402), explaining that this expense alone exceeded its annual income from 2021. [DE 119 at 17, ¶3]. Plaintiff also points to the significant cost it incurred to serve Defendant Bartel—$1,955.45—due to his initial evasion of service. [*Id.* at ¶4].

Based on this, Plaintiff maintains that it will suffer irreparable harm absent preliminary relief because any damages award obtained at final judgment "may come too late" and because it "may not be able to finance [its] lawsuit against defendant[s]." [DE 119 at 17]. The Court questions the sufficiency of these assertions, which fall well short of what other courts have found to be sufficient. For instance, although Plaintiff maintains that the costs of this case are not sustainable, it does not state that costs will cause it to become insolvent or cause its directors to file bankruptcy. *See, e.g., Latitude Co., Inc. v. Reese*, No. 3:21-CV-728 JD, 2022 WL 17076655, at *6 (N.D. Ind. Nov. 18, 2022) ("But Mr. Reese has not argued that, but for the Court entering a preliminary injunction, he will be financially ruined."); *Hamlyn*, 960 F. Supp. at 162 (finding the plaintiff's statements that he is of "limited financial means" to be too vague to support preliminary relief); *Williams v. State Univ. of New York*, 635 F. Supp. 1243, 1248 (E.D.N.Y. 1986) ("In essence the plaintiff must quite literally find herself being forced into the

streets or facing the spectre of bankruptcy before a court can enter a finding of irreparable harm."); and *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 391 (7th Cir. 1984) ("In sum, the loss the loss of the . . . dealership will be painful, but it will not be fatal.").

Moreover, Plaintiff fails to explain how a preliminary injunction will prevent or address its alleged financial harms here. *See Planned Parenthood of Ind., Inc.*, 699 F.3d at 972 (a movant must show that "he will suffer irreparable harm absent the injunction"). The case that Plaintiff refers to in support of its motion—*Roland Mach. Co. v. Dresser Indus., Inc.* 749 F.2d 380 (7th Cir. 1984)— only further demonstrates the deficiencies with Plaintiff's argument. In *Roland*, the plaintiff moved for a preliminary injunction after the defendant suddenly terminated the parties' dealership agreement. *Id.* The injunctive relief requested by the plaintiff effectively asked the court to "force[] [the defendant] to continue dealing with" the plaintiff until the case was resolved, as the plaintiff alleged that it "would go out of business" in the interim without the revenue from this agreement. *Id.* at 382, 391.

But unlike the movant in *Roland*, Plaintiff fails to explain how the preliminary relief it requests would remedy its concerns about the expenses of this lawsuit. *See Elite Ent., Inc. v. Reshammiya,* No. CIV.A. 08-0641 RMU, 2008 WL 9356287, at *4 (D.D.C. Apr. 18, 2008) ("[T]he plaintiff does not demonstrate how a TRO would enable it to stave off any imminent financial catastrophe.") Plaintiff is asking Court to enjoin Defendants' dissemination of its intellectual property, contending that continuing costs of this lawsuit are not sustainable for it. But Plaintiff's cited costs would have been incurred

regardless of injunctive relief. Likewise, Plaintiff generated only *de minimus* revenue prior to this lawsuit, and the requested preliminary relief will not provide it with any revenue to continue financing this case through final judgment. *See Hamlyn*, 960 F. Supp. at 162 (finding that this exception did not apply because "[t]here is no indication . . . that Plaintiff wishes to use the money to finance his lawsuit["); *see also Latitude Co., Inc.*, 2022 WL 17076655, at *4. ("A motion for a preliminary injunction is not meant to short-circuit the legal process that leads to trial but to provide an equitable remedy when no legal remedies are available.") Without more, the Court cannot find that the first two exceptions apply here.

Next, the Court considers the third circumstance—" the damages would be unobtainable from the defendant because it will be insolvent prior to the final judgment." "The resolution of this issue depends on two factors—the [defendant's] resources and the potential magnitude of eventual damages." *Signode Corp. v. Weld-Loc Sys., Inc.*, 700 F.2d 1108, 1111 (7th Cir. 1983). Plaintiff contends that it is entitled to preliminary relief due to the magnitude of statutory damages available in this case in comparison to Defendants' avowals that they lack assets.

The Copyright Act provides that a plaintiff may elect to receive an award of statutory damages in lieu of actual damages and profits. Statutory damages may be awarded "in a sum not less than $750 or more than $30,000" for each infringement. 17 U.S.C. § 504(c)(1). If the infringement is found to be willful, "the court in its discretion may increase the award of statutory damages to an award of not more than $150,000." 17 U.S.C. § 504(c)(2). The Court has discretion to determine statutory damages and

considers factors such as "(1) the infringer's state of mind; (2) the expenses saved, and profits earned, by the infringer; (3) the revenue lost by the copyright holder; (4) the deterrent effect on the infringer and third parties; (5) the infringer's cooperation in providing evidence concerning the value of the infringing material; and (6) the conduct and attitude of the parties." *Bell v. DiamondIndyLimo.com*, No. 1:13-CV-00035-TWP, 2014 WL 2747578, at *1 (S.D. Ind. June 17, 2014). "Statutory damages thus 'serve a dual purpose' of compensating a plaintiff for actual damages that are not easily ascertainable and deterring future copyright infringement." *Hebenstreit Tr. of Est. for Bell v. Merchants Bank of Indiana*, No. 118CV00056JPHDLP, 2021 WL 3810342, at *2 (S.D. Ind. Aug. 26, 2021)

In support of its motion, Plaintiff first presents a table of statutory damages that may be awarded based on the number of infringements Plaintiff alleges it can prove in this case:

| No. | Defendant | No. of Infringed Works | Min. Award under 504(c)(1) ($750) | Max Award under 504(c)(1) ($30,000) | Max Award under 504(c)(2) ($150,000) |
|---|---|---|---|---|---|
| 1. | Bartel | 224 [Doc. 35 at 12, ¶ 27] | $168,000 | $6,720,000 | $33,600,000 |
| 2. | Havel | 486 [Doc. 35 at 9, ¶ 16] | $364,500 | $14,580,000 | $72,900,000 |
| 3. | Weaver | 15 [Doc. 39-1 at 23] | $11,250 | $450,000 | $2,250,000 |

[DE 119 at 20].

While this does demonstrate the potential range of damages, the Court cannot find that Plaintiff's allegations show more than just a mere possibility of the damages to

be awarded. First, Plaintiff begins its argument by suggesting that it may not even seek such damages, stating "[a]ssuming for the sake of argument that Plaintiff will elect to recover its statutory damages . . .." [DE 119 at 20]. Moreover, Plaintiff's motion does not otherwise address the factors the Court considers when determining the appropriateness of statutory damages. The Court is not "obligated to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011). Thus, without any reference to the factors that courts consider when awarding statutory damages, the Court can only find that the magnitude of statutory damages that could be awarded here is speculative.

Plaintiff also alleges that they could not recover any of the referenced statutory damages because the Defendants have avowed to lack assets. [10]  In support, Plaintiff refers to Mr. Havel's and Mr. Bartel's statements that they lack financial resources, that they cannot afford attorneys or process servers, and that Mr. Havel does not work. [DE 119 at 20]. However, later filings provide that Mr. Havel is currently employed. [DE 181-1 at 4 (Defendant Havel stating that he works "10 hours a day, 5-7 days a week to go less into debt")]. And although Mr. Bartel alleges financial hardship, filings show that he is also employed. [DE 34]. Without more, Plaintiff's allegations regarding Defendants' ability to pay remains speculative. *See Monfardini v. Quinlan*, No. 02 C 4284, 2003 WL 21384642, at *3 (N.D. Ill. June 13, 2003) (finding that the defendants' statements

---

[10] Defendant Weaver filed for bankruptcy, which was discharged on April 24, 2023. [*see* DE 100]. Due to her bankruptcy filing, Plaintiff's motion before the Court does not seek injunctive relief against Ms. Weaver. And although Ms. Weaver participated in briefing and even agreed to a stipulated preliminary injunction order, later filings demonstrate that she did not agree to Plaintiff's proposed order for this motion. As Plaintiff has not otherwise included her in the motion, the Court will not consider her status here.

that a judgment could not be collected failed to show the "imminent insolvency" required for preliminary relief).

Finally, as to the fourth circumstance, Plaintiff also explains that monetary damages will be inadequate because its actual damages will be difficult calculate in this action. In response, Defendants dispute that Plaintiff has suffered any actual damages.

"The Copyright Act permits a copyright owner to recover actual damages suffered as a result of the infringing activity and any profits of the infringer resulting from the infringement that are not otherwise taken into account in calculating actual damages." *Bell v. Taylor*, 827 F.3d 699, 709 (7th Cir. 2016) (quoting *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 566 (7th Cir. 2003)). Actual damages are "usually determined by the loss in the fair market value of the copyright, measured by the profits lost due to the infringement or by the value of the use of the copyrighted work to the infringer." *Id.* Thus, "a copyright holder must show that the thing taken had a fair market value. Evidence of the owner's prior sale or licensing of copyrighted work will satisfy this burden when it is sufficiently concrete." *Bell*, 827 F.3d at 709 (quoting *Dash v. Mayweather*, 731 F.3d 303, 318 (4th Cir. 2013).

 Plaintiff contends that its actual damages will be difficult to quantify. Plaintiff maintains that, because it has been "cognizant of the powerful nature of the protected materials," it has neither widely distributed the materials nor sold them for profit. [DE 119 at 18]. Without prior sales, it is "difficult to establish with reasonable certainty the amount of actual damages/lost profits that Plaintiff would have had if Plaintiff charged consumers for its protected materials." [DE 119 at 18].  Plaintiff also contends that

Defendants' actions have diluted the market value of the materials by "making the materials available to anyone with access to the internet." [*Id.*].

But the Court cannot find that Plaintiff's assertions are supported by the evidence before the Court. As stated, to show actual damages, the copyright holder must demonstrate that the items had a fair market value. Plaintiff alleges that it has not sold the materials publicly because of the powerful message behind them, making the fair market value difficult to determine. But as discussed *supra,* evidence shows that Plaintiff obtained the Group's intellectual property rights through litigation via a settlement agreement with the Public Administrator of San Diego County. In this agreement, Plaintiff explicitly "promise[d] to safeguard, archive and control these items thereby agreeing not to sell them." [DE 63-1 at 17; DE 81-1 at 22]. Since Plaintiff agreed that it would not sell the Group's materials, Plaintiff's arguments about lost profits and dilution of fair market value are inapposite. Thus, the Court cannot fairly find that actual damages will be difficult to determine because Plaintiff chose to limit its distribution the works. Instead, the evidence demonstrates that Plaintiff's actual damages can be readily determined as *de minimus*.

Plaintiff also alleges that its damages are difficult to quantify because it could lose its intellectual property rights. But Plaintiff does not expand upon this conclusory argument, nor does it cite any authority in support. Such arguments are considered waived. *Berkowitz,* 927 F.2d at 1384. To the extent that Plaintiff suggests irreparable harm due to the possibility of future infringement by Defendants, this is not sufficient. "[T]he mere likelihood of future infringement by a defendant does not by itself allow

for an inference of irreparable harm" because "future copyright infringement can always be redressed via damages, whether actual or statutory." *Frerck v. John Wiley & Sons, Inc.*, 850 F. Supp. 2d 889, 894 (N.D. Ill. 2012).

Plaintiff also contends that Defendants' actions are irreparable and were intended to be irreparable, as Defendants have shared its materials with multiple third parties and posted the materials on online sharing sites where any internet user could download them. Plaintiff thus maintains that Defendants have caused them to lose control over the distribution of the works. In support, Plaintiff refers the Court to the decision reached in *Fitzgerald v. Murray*, No. 121CV01822TWPTAB, 2021 WL 7502265, at *4 (S.D. Ind. Oct. 20, 2021), where the court stated that "irreparable harm flows from the denial of [the right to control distribution of its copyright materials]."[11] In *Fitzgerald*, the defendant, who lived in Pakistan, had included the plaintiff's copyrighted works in her published book and continued disseminating copies of the book even after publication was halted. *Id.* The Court found that the plaintiff showed a threat of irreparable harm due to both the likelihood that the defendant would continue her infringement and because the plaintiff would not be able to obtain money damages from the defendant. *Id.* at *5. For instance, as the latter, the court observed that the defendant lived in another country and that the defendant had belittled plaintiff's case against her on that

---

[11] Courts have also found that similar conduct may warrant entry of a permanent injunction at final judgment. *See, e.g.*, *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1220 (C.D. Cal. 2007)(observing "it would simply be untenable for Plaintiffs to track and proceed against every infringer who continues to illegally reproduce and distribute elsewhere the files originally obtained through [the defendant's] inducement"); *see also Disney Enterprises, Inc. v. Delane*, 446 F.Supp.2d 402, 408 (D. Md. 2006)("[T]here is no way to know how many times this content has been accessed and downloaded, or if [the defendant] is continuing this infringing behavior.")

basis. Specifically, the court noted that the defendant told plaintiff: "'[Y]ou actually think you'll extradite me from Pakistan? Or get a cent from me? Well, there are unsurmountable hurdles you know.'" *Id.*  But the court cannot find the same concerns here. Moreover, Plaintiff has even conceded that Defendants have since taken down or marked as "private" their alleged infringing videos and have removed copies of videos from their sharing sites while the case has been pending.

In sum, although Plaintiff has clearly demonstrated a likelihood of success on the merits, the Court cannot find that Plaintiff has demonstrated that it will suffer irreparable harm absent a preliminary injunction.  As the threshold showings have not been made, the Court does not need to proceed with the second part of the inquiry. *Latitude Co.*, 2022 WL 17076655, at *4.

### 3.    Final Matters

Defendants have objected to the form and content of Plaintiff's proposed injunction order. But as the Court has declined to enter a preliminary injunction as proposed by Plaintiff, Defendants' motions to modify and strike Plaintiff's  preliminary injunction order are now rendered moot.

The Court must also address two other issues related to Plaintiff's request for preliminary relief. First, even though the Court has denied Plaintiff's motion, the Court must also observe that the proposed order submitted by Plaintiff after the status conference [DE 120] is overbroad and could not have been entered as proposed. As noted above, Plaintiff's proposed order does not reflect any of the agreements reached during the Court's status conference—nor does it even suggest that an agreement had

been reached. Moreover, Plaintiff's proposed order seeks relief beyond preservation of the status quo. For instance, while most of the proposed order asks the Court to prohibit Defendants from copying, displaying, or disseminating the works, it also asks the Court to order Defendants: "to collect and deliver to the Foundation's counsel all copies in their possession, custody, or control of [Plaintiff's works]." [DE 120]. But "[m]andatory preliminary injunctions – those 'requiring an affirmative act by the defendant' – are 'ordinarily cautiously viewed and sparingly issued.'" *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020), quoting *Graham v. Medical Mutual of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997).

Lastly, Defendants objected to Plaintiff's list of the 486 audio works at issue in this case, contending that the titles of the works do not contain their specific subject matter like they did when the tapes were created by the Group. Without this detail, Defendants contend that they cannot be certain which tape is on the list. But Plaintiff responds that the numbering system it uses in its list mirrors the numbering system used by Defendants when they referenced or included the works in their infringing videos. [DE 131 at 3]. Moreover, to the extent that Defendants remain unsure of the contents of the list, Plaintiff has presented a reasonable solution: that, after a protective order is entered, Defendants can email Plaintiff's counsel the lists of works that they already have so that Plaintiff's counsel can confirm whether the descriptions in Defendants' possession are consistent with one or more of Plaintiff's lists for the 486 audio tapes at issue in this case. Plaintiff's counsel will then file the confirmed list under seal. [DE 131 at 5].

At least one of the Defendants has raised a blanket objection to any sort of protective order for discovery. [*See* DE 151, DE 172]. But as the Court discussed via separate order, such outright objection to a protective order is unreasonable and unwarranted here. Thus, if Defendants seek a more detailed list of the 486 audio tapes at issue in this case, they must do so in the manner suggested by Plaintiff after a protective order has been entered.

Having resolved the issues related to the Plaintiff's motion for preliminary injunction, the Court now moves to Mr. Havel's motion.

### B.      Defendant Steven Havel's Motion for Preliminary Injunction [DE 179]

Mr. Havel filed his Motion for Preliminary Injunction on November 20, 2023. Through this motion, Mr. Havel asserts that, after parties' status conference with the Court in June 2023, Plaintiff registered a new copyright (SRu001552631) on more of the Group's audio tapes. Mr. Havel challenges this copyright registration for the same reasons he challenges the copyright registrations at issue here. Thus, Mr. Havel seeks an order prohibiting Plaintiff from registering any additional copyrights or trademarks until this case has concluded so that he does not "have to spend even dozens to hundreds of more hours to defend himself and to prepare for trial and the loss of thousands of dollars more in lost income and expenses related to this lawsuit also because Plaintiffs have added even more illegal copyrights to the case." [DE 180 at 3, ¶(c)2.]. He also alleges that this impacts his and the public's rights to access the Group's intellectual property in the interim. [*Id.* at ¶(c)3.].

36

In response, Plaintiff contends that Mr. Havel has not demonstrated any of the threshold showings required to obtain a preliminary injunction. Plaintiff also maintains that any newly registered copyrights are outside the scope of this case. Despite this, Plaintiff offered to refrain from filing any future registrations so long as there are no extensions of the case management deadlines, suggesting that this moots Mr. Havel's motion. But as discussed *supra*, voluntary cessation of an activity does not render Mr. Havel's motion moot. As such, the Court must address Mr. Havel's motion on the merits.

As stated, Mr. Havel must first make the following threshold showings to obtain preliminary relief: (1) that he has a reasonable likelihood of success on the merits; (2) that he has no adequate remedy at law; and (3) that he will suffer irreparable harm absent the injunction. *Planned Parenthood of Ind., Inc.*, 699 F.3d at 972. Failure to meet his burden on any showing mandates denial of the motion. *Id.*

### 1.   Reasonable Likelihood of Success on the Merits

The Court begins by addressing whether Mr. Havel has shown that he has a reasonable likelihood of success on the merits. As stated, to show a reasonable likelihood of success on the merits, "the applicant need not show that [he] definitely will win the case." *Illinois Republican Party*, 973 F.3d at 763. However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* at 763 (quotation marks omitted). The court does not simply "accept [the moving party's] allegations as true, nor do[es] [it] give him the benefit of all reasonable

inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings." *Univ. of S. Indiana*, 43 F.4th at 791. Instead, the Court must assess the merits as "they are likely to be decided after more complete discovery and litigation." *Id.*

Mr. Havel is asking the Court to enjoin Plaintiff from registering additional copyrights on the Group's materials until after this case has been decided. But Mr. Havel fails to explain how the Court has authority to grant such a request. Under the Copyright Act, "[n]o civil action for infringement of the copyright in any United States work shall be instituted until ... registration of the copyright claim has been made[.]" 17 U.S.C. § 411. Thus, copyright registration is considered "akin to an administrative exhaustion requirement that an owner must satisfy before suing to enforce ownership rights." *Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, ––– U.S. ––––, 139 S. Ct. 881, 887, 203 L.Ed.2d 147 (2019). Due to this pre-suit registration requirement, Plaintiff is not—and cannot be—seeking to enforce ownership rights on any unregistered copyrights here. Unregistered works are thus beyond the scope of this case. Without more from Mr. Havel showing how the Court can enjoin Plaintiff's activities outside the scope of any claims in this case, the Court can only find that Mr. Havel's request is well beyond the scope of any injunctive relief that the Court could grant here.[12]

---

[12] Mr. Havel also alleges that Plaintiff registered an additional copyright, SRu001552631, after the Court's status conference with the parties, and that Plaintiff could seek to add this registration to this case. It is true that *Fourth Estate* "did not squarely address . . . whether a copyright claimant may [later] amend its complaint to include subsequently registered material." *Izmo, Inc. v. Roadster, Inc.*, No. 18-CV-06092-NC, 2019 WL 2359228, at *2 (N.D. Cal. June 4, 2019). And courts have split regarding when such an amendment is permissible. *Compare id.* (dismissing infringement claims for works that were raised in original complaint but not were registered until later on in the case) and *Malibu Media, LLC v. Doe*, No. 18-CV-10956 (JMF), 2019 WL 1454317, at *8 (S.D.N.Y. Apr. 2, 2019) (holding that "an amended complaint may not add copyright claims that, although timely as of the date of their addition to the action, would have been premature when the action was 'instituted.'" ) *with Lickerish Ltd. v. Maven Coal., Inc.*, No. CV 20-5621, 2021 WL 3494638, at *1 (C.D. Cal. Jan. 29, 2021) (permitting an amendment adding new

But even if such relief could be granted, Mr. Havel has also failed to meet his burden on any of the required threshold inquiries. As to this, Mr. Havel largely contends that he is entitled to this requested relief because he will succeed in showing that Plaintiff fraudulently registered the copyright and trademarks at issue in this case. In support, Mr. Havel's Motion for Preliminary Injunction first points to his "Updated Defense and Counter Claim" [which] he alleges "shows a great deal of evidence of a reasonable likelihood of success plus if Defendant receives the Requested Documents and responses to Admissions and Interrogations that success will have even a greater likelihood of success." [DE 180 at 3-4]. Mr. Havel also contends that Plaintiff's registration of this new copyright demonstrates that Plaintiff anticipate it will lose this case. Mr. Havel also challenges the accuracy of Plaintiff's newest registration, including the author listed, the name Plaintiff used, and its group registration. [DE 180 at 5-8]. But the Court cannot find that these arguments demonstrate a reasonable likelihood of success on the merits.

First, to extent Mr. Havel wishes for the Court to base its ruling on arguments made in his amended defenses and counterclaims—but not otherwise made in this motion—the Court declines to do so. First, Mr. Havel's defense and counterclaim are over 100 pages and are part of a filing consisting of over 500 pages [*See* DE 153 at 81-127, DE 153-1 at 1-45]. It is not the Court's duty to comb through Mr. Havel's defenses

---

infringement claims in an existing lawsuit so long as the registration was issued prior to the amendment). That said, Plaintiff has not sought to amend its complaint to add any subsequently registered copyrights, so the Court need not address this issue now.

and counterclaims to determine whether he has met his burden here. Indeed, "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). "Merely referencing arguments presented elsewhere is not sufficient to put those arguments before the Court." *Baker v. Match Grp., Inc.*, No. 22 CV 6924, 2023 WL 8236896, at *3 (N.D. Ill. Nov. 28, 2023) (internal citation omitted). Accordingly, the Court declines to base its ruling on any arguments that Mr. Havel may have raised in his defense and counterclaims but did not include in the instant motion.

The Court now turns to the arguments Mr. Havel has presented. To start, Mr. Havel acknowledges that Plaintiff has presented copies of copyright and trademark registrations. Mr. Havel also acknowledges that such registrations are often presumed to show ownership of a valid copyright. [DE 180 at 11]. But, like his response to Plaintiff's preliminary injunction motion, Mr. Havel contends that he can rebut that assumption by showing that Plaintiff obtained these registrations fraudulently. [DE 180 at 11].

Mr. Havel again relies on the Court's ruling *in re Estates of John Michael Craig, et al.*, No. PN022228 (Cal. Super. Ct. Feb. 22, 1999). Thus, Mr. Havel contends that Plaintiff has "not provided any Will from any of the Members of The Group" and has "not provided any 'Assignments' to legitimize the Intellectual Property Legal Transfer from [the Group] to the Telah Foundation." [DE 180 at 12, ¶¶ 4, 6]. But as discussed regarding the merits of Plaintiff's claims *supra*, Mr. Havel also acknowledges that this February 1999 decision was not the final outcome of that case, as the California court later approved a settlement agreement between the Plaintiff and the Public

Administrator of San Diego which stated that "Don Billings, Public Administrator . . . hereby agrees to transfer and convey to the [Plaintiff] by through and Mark King and Sarah King all right, title, and possession, of the following property, including any intellectual property rights." [DE 63-1 at 17].

Thus, as discussed *supra*, even if the Court could grant the preliminary relief Mr. Havel requests, the Court cannot find that he has demonstrated a likelihood of success on the merits.

### 2. Irreparable Harm/No adequate remedy

Mr. Havel also fails show that he will suffer irreparable harm absent injunctive relief, primarily arguing that he will have to spend additional time and money defending himself if Plaintiff registers more works. But the harm primarily alleged by Mr. Havel—that Plaintiff may continue registering works, causing Plaintiff to assert additional infringement claims against him, thereby resulting in additional litigation expenses for Mr. Havel—is attenuated and speculative at this point, and as, discussed *supra*, relates to issues that are wholly outside the scope of this case. "Issuing a preliminary injunction only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the [party] is entitled to such relief." *Winter*, 555 U.S. at 22.

Moreover, Mr. Havel primarily alleges financial harms due to the costs he will incur when—or if—Plaintiff files additional lawsuits against him. But "the possibility that adequate compensatory or other corrective relief will be available at a later date, in

the ordinary course of litigation, weighs heavily against a claim of irreparable harm."

*D.U. v. Rhoades,* 825 F.3d 331, 338 (7th Cir. 2016). It is true that there are exceptions to this standard that would allow for preliminary relief for monetary damages, as discussed *supra*, but Mr. Havel has not alleged that any of these exceptions apply to him. *See Hamlyn*, 960 F. Supp. at 162 (observing four circumstances where monetary damages can constitute irreparable harm). [13] Mr. Havel has also alleged that additional registrations will keep him and the public from accessing the Group's Teachings, and therefore, will keep him from practicing his religious beliefs. But Mr. Havel has also alleged that he currently has his own copies of the Group's works. The Court has not ordered the Defendants to return copies of the Group's materials that may be in their physical possession. And nothing in this ruling prohibits Mr. Havel from privately accessing his copies of the Group's works. Without more, the Court cannot find that he would suffer irreparable harm to his religious practices absent injunctive relief.

Mr. Havel has similarly failed to show that he has no adequate remedy at law. On this, Mr. Havel simply states that "[t]here is no other way [he] knows about to restrain Plaintiffs from registering more copyrights. Defendant exchanged emails with the U.S. Copyright [O]ffice and they said the only way Defendant could challenge a copyright registration was through the courts." [DE 180 at 3]. But such conclusory statements are not sufficient to meet his burden here. *Mazurek,* 520 U.S. at 972.

---

[13] Mr. Havel has alleged elsewhere that he is of limited financial means. But these vague assertions, without more, are insufficient. *See Hamlyn,* 960 F. Supp. at 162.

Accordingly, the Court cannot find that Mr. Havel has shown that he is entitled to an extraordinary remedy like a preliminary injunction. *Winter*, 555 U.S. at 24. His Motion for Preliminary Injunction must therefore be denied.

## IV.   Conclusion

Based on the foregoing, the Court now:

- **DENIES** Plaintiff's Redacted Motion for Preliminary Injunction [DE 118];

- **DENIES** as Moot Defendant Havel and Defendant Weaver's Motions to Modify Plaintiff's "Proposed" Order for Preliminary Injunction [DE 121, DE 122];

- **DENIES** Defendant Bartel's Motion to Strike The Evolutionary Level Above Human Inc.'s Redacted Proposed Order for Preliminary Injunction [DE 162]; and

- **DENIES** Defendant Havel's Motion for Preliminary Injunction [DE 179].

**SO ORDERED** this 27th day of February 2024.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge