UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

The Evolutionary Level Above Human Foundation
d/b/a The Telah Foundation,

      Plaintiffs,

v.

Stephen Robert Havel,
Cathy Weaver,
Jason Bartel

      Pro Se Defendants

Case No. 3:22-CV-395-DRL-SJF

-FILED-

DEC 02 2025

Chanda J. Berta, Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

## DECLARATION OF STEPHEN HAVEL

I, **Stephen Havel**, declare as follows:

I. Introduction

II. Background and Personal Involvement with the Heaven's Gate Class

III. My Knowledge of and Participation in the Creation and Use of Heaven's Gate Materials

IV. Receipt of Rkkody's 1997–1998 Digitized Audio Materials (Exhibit 22)

V. Receipt of Jhnody's Tape Logs, Cassette Labels, and Digital Archive (Exhibit 25)

VI. Problems with Plaintiffs' Audio Tape Lists (List 1, List 2, and Exhibit H)

VII. Additional Evidence of Plaintiffs' Ownership Conflicts

VIII. Probate Court Record and Plaintiffs' Copyright and Trademark Claims (Exhibits 4 & 6)

IX. Authentication of Exhibits

X. Declaration Under Penalty of Perjury / Signature Block

1

## I. INTRODUCTION AND BACKGROUND

**1.** My name is **Stephen Havel**, also known as "Sawyer," "Swy," or "Swyody," names I used while I was a member of the Heaven's Gate Class ("The Group", "The Class") that was brought to be in 1975 by those known as TI and DO, aka Peep and Bo, respectively, The UFO Two, The Two, Bonnie and Herf and other silly names like Guinea and Pig. I make this declaration based on personal knowledge unless otherwise indicated, and I am competent to testify to the matters stated herein.

**2.** I was a full time active member of what became known as the Heaven's Gate Class for 19 years from September of 1975 to September of 1994. During that time, I personally participated in the Group's internal study, over a 1000 teaching sessions that were recorded onto audio cassette tapes, video production, dissemination of materials to many media groups during the times the Group was providing a public interface in 1975-6 and then again in 1994 and then after the Group members left this world, to most every National media group in the U.S. (i.e. CNN, CBS, ABC, BBC, National Geographics channel, HBO Max, Inside Edition, etc., from 1997 to date, and in the preservation of the Group's writings, audio, and video teachings.

**3.** I personally knew and experientially studied under the two teachers, DO (Marshall Applewhite, Jr.) and TI (Bonnie Lu Truesdale Nettles). I also personally knew and worked alongside up to about 100 other students including Crlody (co-defendant Jason Bartel), Jhnody (Juan, Francisco Falcon), Neody (Rio D'Angelo), Plaintiffs' Mark King (Mrcody) and Sarah King (Srfody) and most of the deceased members including Rkkody (Humphrey), Ollody, and many others who left the Group and are still with us. I can be seen and heard helping DO in my

time in the group in about 5 of the 12 sessions of the Beyond Human – The Last Call Video Series.

4. The materials at issue in this lawsuit — the audio tapes, video tapes, writings, and artwork — were created by far, almost entirely by TI and/or DO, since 1975, and a tiny amount of mostly written materials by student members of the Group, starting in earnest more in the 1990's as encouraged by DO, for those that wanted to try their hand at writing. The Groups main method of obtaining some legal status to use as a company name was mostly accomplished by forming dba's, aka Trade Names. I think it was between 1987 and 1989 that a fellow classmate, Srrody (Steven McCarter) and I formed two dba's offering contract computer programming that were called Think Link and Word Wise. TI and DO examined often becoming a non-profit. Even Telah Services was referred to by Judge Lisa Guy Schall in around 1999 as a "Trade name". I suspect it was mostly for security that they stuck mostly to dbas. So they did not register legal copyrights or trademarks nor assigned their rights as creators of their own intellectual property to anyone, though they at times considered doing so and that can be heard being talked about in several audio tapes. Ollody, aka Olliver Odinwood and legally David Cabot Van Sinderen was one exception – In 1982 he, under the pen name of Olliver Odinwood took out a copyright registration for 14 Acrylic paintings he painted as illustrations for The Meeting Screen play. I witnessed him painting some of them as did Mark King who was working on creating stained glass windows in the little cubicle next to where Ollody was painting the Rings of Saturn picture that is part of one of the pictures that was like a logo that was given to me by Rkkody in 1997, that included nearly 200 audio tapes, video tapes, writings and many images that I gave away to people and used on my YouTube channel: 3spm since 2007, that was never monetized and has a very small amount of subscriptions, like around 3000 since that time so poses no threat to anyone

3

from doing and yet now I'm being sued for millions of dollars for doing so, who have also dragged Cathy Weaver into because she took an interest in the story and tried to help us (the Kings and myself and Crlody (co-defendant Jason Bartel) work together over release of the audio tapes above #218 or so and because she and I wore T-shirts with images on them and sought to sell some to be able to pay to make more - again, the very images that Havel had been displaying on his channel since 2007, that Mark King and Sarah King (Plaintiffs) knew well about, as they also knew about for many years well before the lawsuit was filed in 2022, that Crlody was behind the 4shared.com file sharing site where the audios Crlody helped Rkkody digitize in 1997 and mail out to people on CD's were posted. The Kings also knew the groups 11 main video's (7 Beyond Human Video tapes and 4 exit videos) had been posted on HeavensgateDatabase for many years before the lawsuit. When Havel and Weaver asked Mark and Sarah King about those video's on that site Mark King said, "we let it slide". I diverge, but I'm sure Sarah King was also well aware of the prints made from Olliver Odinwoods paintings that included the Celestial Being Entity C.B.E. as it and the other 13 or so were framed and hung on the wall for public display in the meeting room office space TI and DO and Crew, including me who worked as an Astrologer there, made into a brief business enterprise in the early 1980's called Astrologics that opened their doors to the public, where I and others also gave talks about discarnate spirits and other paranormal topics to small audiences, which was in Amarillo, Texas around 1982.

## II. MY ROLE IN THE GROUP AND CREATION OF MATERIALS

5. I am personally present in five of the thirteen "Beyond Human — The Last Call" instructional video sessions ("Beyond Human Videos") DO made. I was also part of the video crew during the filming of this series. DO had leased a new warehouse space in Laguna Hills, California. The

4

film crew consisted of Srrody, Jwnody, Lggody, Swyody, Lvvody, Jnnody and DO. We used two cameras. The bottom of the warehouse was filled with RV's – popups and small and large trailers and their pullers. It was high tech with satellite TV dishes on the rooves of the two warehouses being leased from which we could keep up with the news and also watch the many evangelical teachers to see if there was any kind of interface with anyone anymore. Before the Beyond Human series was shot, DO was thinking students would be the ones making video's and he would step back from that task. A number of student partnerships auditioned for the task and Jwnody and Swyody were chosen by the students and DO to shoot a video that was uploaded to an Evangelical satellite TV channel that was broadcast. But there was no reply so DO began to think again whether TI would want them to go public again in some way. DO included the student body in brainstorming as can be heard in the audio tapes.

**6.** I also participated in the Group's 1993 satellite broadcast of the Beyond Human series, which was transmitted on the Hughes Aerospace satellite system and broadcast on a public-access satellite channel. This demonstrates that the Group intentionally disseminated these works to the public.

**7.** The Group did **not** treat these materials as restricted or proprietary. They were created for distribution and were expressly intended to reach a broader audience beyond the Group itself. This was said by me and my fellow students and by TI and DO from 1975 when they sent us out to talk to the public who showed interest. If someone didn't ask questions of us they didn't find out much. That happened again in 1994 going city to city across the U.S. again and then after I left continued without face to face meetings.

## III. RECEIVING MATERIALS FROM RKKODY (1997–1998)

8. In late 1997 and early 1998, I personally received two CDs, two times and included a third large capacity video disk with the latter 2 CDs from Rkkody ("Right to Know"), who digitized with co-defendant Jason Bartel's help and sent to a bunch of libraries approximately 200 audio recordings from 1982 to 1985 and the contents of the CD's of most all the Groups Intellectual Property created by the Group. (See Exs. 22, 18, 19.)

9. These CDs were mailed to me in original mailers bearing postmarks from December 29, 1997 and January 6, 1998, shortly after the Group's exit in March 1997. (See Exs. 22, 18, 19.)

10. Attached as Exhibit 22 are *true and correct copies* of:

- the Rkkody CDs I received,
- the CD labels,
- photographs of the mailers,
- the digitized content lists showing audio files with the numbers 1 to 218 on them
- and the common-law copyright statements printed on the discs and included in the included README.txt file on each CD. (See Exs. 22, 18, 19.)

11. These CDs contained Group-created teachings, including audio teachings that TELAH now claims to own exclusively. However, the Group itself, through Rkkody, disseminated these recordings without restriction. (See Exs. 22, 18, 19.)

12. The labels on these CDs showed the same common-law copyright notices the Group had put on their first and second edition Book to still be seen on the heavensgate.com website under the

Book tab and the Group never assigned their copyrights to TELAH or the Kings. The Kings were given the task if they wanted it to be "dividers of the items of value" (in certain storage rooms near San Diego) among those who were inclined to disseminate them and could sell some of those items of value to help pay for the living expenses of those doing that dissemination. These desires of the Class were described in the Letters to Mrc/Srf (Mark King/Sarah King). The Kings gave their letters to Rkkody so he was the first one to possess some of the items of value. (See Exs. 22, 18, 19.)

### IV. MATERIALS RECEIVED FROM JHNODY (2021)

13. In 2021, I received from Jhnody a thumb drive containing more than 900 digitized audio recordings and a tape log file listing a tape number/letter combo, recording dates, durations, and detailed content descriptions for those recordings. (See Exs. 10, 11, 12, 14, 27.)

14. This tape log file is the source of Plaintiffs' "Exhibit H" (filed with their Complaint) that shows tape numbers from 1 to 929 (though as many as 20 of those numbers are missing because they were old and worn out). This Exhibit H is from Havel's blog sawyerhg.wordpress.com where Havel had posted the log file he received from Jhnody via the thumb drive. (See Exs. 10, 11, 12, 14, 27.)

15. Attached as Exhibit 25 are *true and correct copies* of:

- Screen shots of Jhnody's 84 audio cassette tapes showing their labels showing tape number, date, description and duration in photographs for tapes 812–896. These were sent to Jhnody by Mark King and Sarah King a year or more before the lawsuit was filed.

- Screen shots of the Cassette tape log entries (3 pages) for the same Cassettes that match the same numbered tapes in the Exhibit H log file

Additional Screen shots of The Groups Material content sent to Jhnody by The Group in March of 1997:

- Screen shots of Original Masters of the Beyond Human – The Last Call video's with a letter encouraging him to give them to the media or anywhere he wanted to put them.
- Screen shots of the diskette that contained the code and images for the Heavensgate.com website. d supporting evidence of the Group-created metadata.
- Screen shot of the diskette that contained 2 exit video's DO's Final Exit and Students Expressing themselves before exit.
- Screen shots of 4 Away Team patches
- Screen shots of the Big Blue Book – the first edition of the Heaven's Gate Book, "How and When Heaven's Gate (The Door to The Kingdom Level Above Human) May be Entered that is made from legal size paper and gold embossed lettering of "Heaven's Gate" that he received a number of copies of and that show on it's copyright page the common law notification to "Heaven's Representatives allowing for copying parts or the whole as long as it is not for commercial profit making purposes.

(See Exs. 10, 11, 12, 14, 27.)

16. These cassette labels were handwritten and maintained by Group members in the 1990s. They show the actual dates and durations and descriptions of the content of the recordings.

(See Exs. 10, 11, 12, 14, 27.)

## V. CONTRADICTIONS IN PLAINTIFFS' LIST 1 AND LIST 2

17. Plaintiffs rely on two lists of audio recordings ("List 1" and "List 2") to assert ownership and define the works covered by their registrations. These lists contain major flaws and potentially a criminal manipulation of evidence and can not be accidental as over a hundred audio tapes have been hidden. (See Exs. 10, 11, 12, 14, 27.)

18. List 1 includes 486 tapes that Plaintiffs claim were registered with the Copyright Office but within that List 1, there are 17 audios that have no runtime listed and the tape numbers with no runtime match the tapes that were absent in the Exhibit H logfile and in Rkkody's 1997 logfile he got from the Group via picking up a box of tapes in Storage a day before San Diego County found out about the storage room and confiscated it's contents that included the other some 600 more audio tapes. The "deposit" on the audio tape copyright registration indicates there are 486 cassette audio tapes. But since 17 are not there and there is evidence Plaintiffs knew they were missing from the deposit and said nothing about it to the copyright office means they didn't want to correct that error. They are still maintaining that List 1 and List 2 are accurate. (See Exs. 10, 11, 12, 14, 27.)

19. List 2 claims the final tape number is 1082, but Mark King stated to me in an email before this lawsuit that there were 1061 tapes, not 1082. Mark King also came into my livestream months before we were sued and said there were 1061 tapes. During a hearing with Judge Gotsch, Plaintiffs attorney Mr. Isaac Crumb said there were "over 1000" audio tapes. The tape that was in the Jhnody provided logfile that became part of Exhibit H of Plaintiffs complaint (dtk 1, 132 (amended)) as tape number 929 that contains a phone call with Jhnody himself with members of the Class and is 17 minutes long and is dated 01/25/97 was removed from List 2 so

9

that List 2 says tape 1082 is the last tape recorded on that same date with the same duration of 17 minutes. We have on record Mark King in an email with Jhnody saying he would be cut off from receiving any more tapes, but if this List 2 becomes authenticated in this Judgement it will me blocking out as many as 132 audio tapes from existence except in the hands of the Kings. (See Exs. 10, 11, 12, 14, 27.)

20. The dates and durations in List 2 are inconsistent with the authentic tape labels in Exhibit 25 and with Jhnody's tape log (Exhibit H). For instance audio tape 849 in the Exhibit H list and then cassette labels list shows a date of September of 1994 and says in the description it's about Swyody (Havel) leaving the Group. I did leave the group in September of 1994 as I've talked about perhaps many dozens of times in documentaries, etc. Yet List 2 says tape 849 was recorded on 11/14/93 when I was in the group and around the time I spoke at a public meeting with Jwnody in Denver which was a test meeting to see if there was any public interest in the Groups information. (See Exs. 10, 11, 12, 14, 27.)

21. Attached as Exhibit 27 is a *true and correct comparative table that I created*, comparing:

- Plaintiffs' List 2,
- Plaintiffs' Exhibit H (from Jhnody), and
- the Group's cassette label metadata (Ex. 25),

    for tapes 812–896.

(See Exs. 10, 11, 12, 14, 27.)

22. Exhibit 27 shows extensive discrepancies:

- mismatched dates,
- incorrect durations,
- missing entries,
- reordered numbering,
- possibly entries added by Plaintiffs that do not correspond to actual tapes.

(See Exs. 10, 11, 12, 14, 27.)

23. These contradictions demonstrate that List 2 is litigation-constructed, not an authentic Group artifact and it seems to have been done to hide about 132 audio tapes from public scrutiny by Plaintiffs.

(See Exs. 10, 11, 12, 14, 27.)

## VI. BREYER CONSENT ORDER (1999) AND PLAINTIFFS' NONCOMPLIANCE

24. In 1999, Judge Breyer entered a Consent Order requiring TELAH (Mark and Sarah King) to:

a. Change the content of Rkkody's two CDs, on the CD that contained the some 196 digitized audios to remove "rkkody.com" and to

b. Produce new CDs and to

c. Disseminate those CDs to the public

(See Exs. 4, 6, 7, 8, 9, 12, 22.)

25. Attached as Exhibit 23 is a *true and correct* side-by-side comparison I assembled showing:

- the original Rkkody 1997–1998 CD content showing about 200 audios

11

- the two CDs produced by TELAH after the Breyer Order,
- and the six total audio files TELAH added to those two CD's perhaps to appear to have followed the Breyer Consent Decree in 1999.

(See Exs. 4, 6, 7, 8, 9, 12, 22.)

26. Plaintiffs only produced two CDs containing six audio files. They did not disseminate the some 200 audios that were on the Rkkody CD's to Havel or Bartel nor anyone else I ever heard of. (See Exs. 18, 19, 22, 31.)

27. The Rkkody CD content proves that Rkkody's 196 or so audios were not part of the Kings 1999 settlement with San Diego County but became part of the Breyer 1999 settlement agreement.

(See Exs. 18, 19, 22, 31.)

## VII. VISUAL ARTWORK (OLLIVER ODINWOOD / OLLODY)

28. Attached as Exhibit 26 is *a true and correct copy* of the 14 Acrylic oil paintings - artwork painted and copyrighted by Ollody under his pen name "Olliver Odinwood" in 1982 thus the Kings copyright as the Telah Foundation of the Celestial Being entity and the log is moot and their copyrights and trademarks should be rescinded. (See Exs. 16, 17, 29.)

29. This artwork was independently copyrighted before TELAH existed, and TELAH has no assignment of it. (See Exs. 16, 17, 29.)

## VIII. PROBATE COURT RECORD AND PLAINTIFFS' COPYRIGHT AND TRADEMARK CLAIMS

30. I have personally reviewed the 1997–1999 probate filings from the San Diego County Public Administrator relating to the estates of the thirty-nine Heaven's Gate members. These include the documents I have attached in this action as Exhibit 6 (the earlier Findings prior to settlement) and Exhibit 4 (the Supplemental Brief filed by the Public Administrator). I maintain true and correct copies of these documents in my possession. (See Exs. 4, 6, 7, 8, 9, 12, 22.)

31. The probate materials show that none of the thirty-nine deceased members executed a will, copyright assignment, trademark assignment, or other written transfer conveying intellectual-property rights to Mark King, Sarah King, or the TELAH Foundation. Under both federal copyright law (17 U.S.C. §§ 101, 201, 204) and California probate law, the absence of any written transfer means the copyrights and trademarks remained with the decedents' estates.

(See Exs. 4, 6, 7, 8, 9, 12, 22.)

32. The Public Administrator expressly informed the probate court that TELAH Foundation had no legal authority or ownership interest in any of the Heaven's Gate materials. The Administrator emphasized that TELAH's later-filed copyright registrations could not override the fact that the estates never transferred rights to them. These probate statements directly contradict Plaintiffs' representations in this lawsuit that they obtained exclusive ownership.

(See Exs. 4, 6, 7, 8, 9, 12, 22.)

33. The probate filings further indicate that only a small set of identified items was located in the residence, and none of these were transferred to TELAH. The Administrator rejected the Kings' theory that they could "inherit" intellectual property without a will or assignment. The Administrator also explained that post-mortem registrations cannot create ownership where no chain of title exists.

(See Exs. 4, 6, 7, 8, 9, 12, 22.)

34. Based on these probate findings, it is my understanding and belief that Plaintiffs did not legally acquire any copyrights, trademarks, or related intellectual-property interests from the Heaven's Gate members. This evidence undermines Plaintiffs' claim of exclusive ownership in Counts I–V of their Complaint and creates further material disputes relevant to their Motion for Summary Judgment. (See Exs. 4, 6, 7, 8, 9, 12, 22.)

## IX. AUTHENTICATION OF ALL EXHIBITS

35. I declare under penalty of perjury that Exhibits `1,2,3, 4, 6, 7, 8, 9, 10, 12, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28 and 29 attached to Defendant Havel's filings are true and correct copies of the documents, communications, court records, webpages, logs, lists, or digital materials that I personally received, reviewed, or created. These exhibits are the basis of the facts stated in this Declaration.

## X. EXECUTION & SIGNATURE

36. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: NOV. 28, 2025

At: Savannah, GA

Respectfully submitted,

Dated: 11-28-2025

*Stephen Havel*
Stephen Havel

5776 Grape Rd.

Suite 51

PMB# 121

Mishawaka, IN. 46545

Sawcat575@gmail.com

Pro Se Defendant