**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

THE EVOLUTIONARY LEVEL ABOVE HUMAN, INC.
d/b/a THE TELAH FOUNDATION,

FILED – OCT 05, 2026 – PM12:23
US DISTRICT COURT
Northern District of Indiana
Chanda J. Berta – Clerk

Plaintiff,

v.

STEPHEN HAVEL; CATHY WEAVER; and JASON BARTEL,

Defendants.

CAUSE NO. 3:22-CV-395-DRL-SJF

**DEFENDANT STEPHEN HAVEL'S REPLY IN SUPPORT OF MOTION TO RECONSIDER AND REVISE THE AUGUST 26, 2026 INTERLOCUTORY ORDER UNDER FED. R. CIV. P. 54(b)**

Defendant Stephen Havel, appearing pro se, respectfully submits this reply to Plaintiff's Response in Opposition to Defendants' Motions for Reconsideration, Dkt. 287.

TELAH's response does not answer the questions presented by Havel's Rule 54(b) motion: whether the record establishes the necessary connection between the particular numbered recordings Plaintiff alleges Havel played, the particular copyrighted works covered by Plaintiff's registration evidence, and the particular intellectual-property interests transferred through the 1999 probate proceeding.

**Some History for context:**

This subject of exactly which audios Havel is being accused of infringement of Plaintiffs Registered Copyrights was never resolved and Havel brought up the subject in the first zoom hearing with Judge Gotsch in which Judge Gotsch on the spot ordered Plaintiffs to document, which was at the beginning of Discovery and tied to Plaintiffs filing their motion to bring about a

Preliminary Injunction against Havel, et al. As the Court record states, during that hearing that attorney for Plaintiff's, Isacc Crum was in the meeting and when Mr. Crum stated that Plaintiffs had copyrights for all the audio tapes and numbered them as over 1000. Havel responded saying that wasn't true, that they only had a registration for 486 cassettes. Havel added during the Hearing that I guess he would have the option to use/play the audio tapes not registered and Mr. Crum responded that they would then register copyrights for all the audio tapes. Then Judge Gotsch ordered two lists be filed by Plaintiffs, one for the "registered" audios and one for the un-registered audios. Plaintiffs then revised their Motion for a Preliminary Injunction to include the two ordered Lists while trying to establish that all the audio tapes were now the Audio Works, no longer separating them into registered and un-registered which was the implication in Plaintiffs Complaints.

Simultaneously Plaintiffs registered copyrights for two batches of 10 audios each and Mr. Crum told Havel they couldn't register them under a "group name" so that is why they chose to list as the author to one batch of 10 tapes that Steven McCarter was the "author" because he was likely in the tapes working the tape recorder recording what the teacher DO said. Mr. Crum told Havel he didn't know why they didn't just say DO was the author as he is heard 99% of the time on all 900 or more audios. Perhaps the reason for that was because DO's (Marshall Applewhite's) son Robert was still alive and perhaps he could fight for them.). However that does bring up what the reason was to list as Author T.O.A. (Total Overcomers Anonymous) on that batch of audio tape cassettes in the 1997 registration being fought over now – as for all but about 196 of the tapes DO is 99% the Author and TOA was simply a dba the Group used while I was still in the Group to receive mail from some of their public postings. They registered those copyrights as "work for hire" yet had no documents to authorize that designation. This way they could appear to be

"workers" though they were not official Group members and did not contribute to hardly any of the audio tapes.

Judge Lisa Guy Schall in the Probate decision spoke to the Kings not presenting any evidence to support their copyrights but they didn't go away. The Judge Breyer case settled before much scrutiny of anything the Kings filed and said and actually ruled before the Judge Guy-Schall Settlement.

However, in seeing the two Lists provided by Plaintiffs, Havel was surprised that the robust descriptions were gone. Why get rid of the robust descriptions in logs from the Group since 1997 and ignore that even more robust descriptions in the very logfile Plaintiffs included from Havel's blog post at sawyerhg.wordpress.com as their Exhibit H of their Complaint and Amended Complaint, (the very logfile Plaintiffs sent to Jhnody (Falcon) over years that Falcon eventually sent to Havel that was a big part of the trigger for this lawsuit), and replace those descriptions with one general description of "Various Discussions". Havel learned from attorney for Plaintiffs while working together on Havel's many Discovery requests as ordered by Judge Gotsch for us to do, that he put the two Lists together. What was the source for those two Lists? Why didn't Plaintiffs have a simple list of what was sent to the copyright office unless there was no list. This is typical for the way Plaintiffs would not share with Havel and Bartel hundreds of audio tapes, until Jhnody (Falcon) decided to share some hundreds of them with Havel.

Were the Kings trying to hide something that the descriptions revealed? In fact the descriptions did reveal TI and/or DO's talk about them in a few tapes and DO talking about why they were sent out of the Group in 1997 that was not that flattering that Havel was almost the only witness to, that Havel talked about publicly when the Kings would tell a much different story to the media. That is a big part of why this lawsuit was filed to try to shut up Havel and there is some

evidence of that in Plaintiffs latest Status Report where they were willing to drop all the Infringement financial penalties in exchange for the Court ordering Havel and Weaver to turn over to the court all their Heaven's Gate related Intellectual Property and bring an injunction against their use of various social media sites – complete removal of my "religious freedom". But it also appears to be a way to end this lawsuit to where they can still hope to recoop their massive attorney fees that they never needed to incur in the first place as Weaver had worked very hard to arrive at a settlement pre lawsuit.

Finally in this historic introduction Havel wants to leave record of why Havel filed his response to Plaintiffs Summary Judgement so poorly. When Havel started responding to up to 86 of Plaintiffs "Statements of Fact", the document was more than double the allowable response as Havel understood it. So Havel cut it back over and over. This was a huge undertaking while Cathy Weaver was going through nervous breakdowns over this entire process and Havel couldn't keep up with working to pay our minimal bills and we had to move to a new location closer to South Bend. Havel filed an extension request and knew if he didn't file this correctly he could lose the entire case. But Havel took very seriously responding honestly to Plaintiffs many Statements, many of which were not truthful or were exaggerated in Plaintiffs viewpoint they wanted to make into the court record and influence the court by saying. Throughout this case Havel came to recognize that if something is let stay inaccurate it then will be used against Havel later and many of those "Statements of Fact" list as references Mark King's Declaration and other of their filings that at the times of those filings Havel had a lot to say about.

I was not surprised that I didn't follow all the procedures correctly and that Plaintiffs would use that to not respond to my responses to their Statements of Facts. I hoped the Court would still allow my testimony but perhaps ask for better documentation. I tried to do it correctly and in all

my court filings, often at the courthouse in South Bend, Indiana, I never had to instruct the Clerk to keep the Exhibits as separate files as the Court reprimanded me about. My first draft of my responses to Plaintiffs Statement of Facts did a much better job of providing paragraph references to the Exhibits I was providing. But to meet the size requirements of the response I had to keep cutting back the reference text since there were some 86 of those Statements of Facts I couldn't allow to become real fact buy not calling them out.

What follows are some of the existing Disputes that have been disputes for almost the entire four years in this lawsuit against me that I hope the Court will re-examine. Havel chose to bring out the context of what Plaintiffs referred to as the Court saying on pages 2 and 3 of their blanket denial of all three 54b motions. Here is a bit of a piece by piece breakdown. Plaintiffs write about what the Court said in Dtk 276:

**"It considered Defendants' arguments concerning TELAH's corporate and assumed names,"** (which Havel (and Weaver) had nothing at all to do with as that was Bartels direction); **"the California probate proceedings, the scope of the probate settlement, "** (but makes no mention of the fact that in Judge Lisa Guy-Schalls initial Decision all the Copyrights provided to the court from Mark and Sarah King were not proven to be valid, and in fact the Sansone Trial Brief used the word, "fraudulently" to describe how those copyrights were obtained being they supplied nothing written from the decedents to justify the Kings taking out copyright registrations for audios and video's and the C.B.E. Image and patches, etc., yet a number of those same registrations were used in this case as shown in Exhibits A thru J of Plaintiffs Complaint and Amended Complaint. In those complaints there was hardly a mention of the Probate rulings nor the Northern California Judge Breyer Settlement. In that Probate Settlement there is no mention of the fact that there was no inventory of what was in the "boxes of cassette tapes" San

Diego County found in storage in late March of 1997. Thus we don't know what audio tapes were ruled over in that Probate Settlement. Thus Havel (nor weaver) or Bartel for that matter havn't been proven to have infringed on that content. In fact if one looks at Judge Breyer's ruling, the Kings were ordered to "disseminate" the Groups information and "distribute" the Video tapes according to how the Group set it up, giving a tape to someone and getting it back to give it so someone else. Rkkody's CD's (that he mailed to Havel in 1997 and 1998) were to be re-designed to only have the audio recordings on them for dissemination (and that never really happened as I never received them from the Kings. Further, the Kings refused to provide Judge Breyers, "Settlement Agreement" that gave the details of how to perform the dissemination and distributions and to whom (as we learned was in the Settlement Agreement that Bartel told Havel about in about 2016 well before this lawsuit).

Also, the fact that Judge Guy-Schall wrote in her decision that "no gift" was found was related to the C.B.E. Lithographic Print Plaintiffs copyrighted in 1997 that was one of several gifts given to at least one other former member named Rkkody because one can see it for sale on rkkody.com (which I have presented to the court but may not have been seen yet);

**"chain of title,"** (which there is none for any of the Groups Intellectual Property that goes to the Kings by any name) ;

**"the absence of written assignments,"** (which is a major flaw in Plaintiffs case that they were repeatedly saying they had the "Assignments" for but never showed any to now three courts and one of the only ways they could legally copyright something besides having Assignments from the creators of the material would be through the law, like the Probate and Breyer case, yet neither of those cases document what specific tape numbers were under that order);

**"registration and deposit materials, missing tapes,"** (because the "Deposit" that was registered copyright for by Plaintiffs was for "486 cassette tapes" and Plaintiffs have been asked to list the specific tape numbers but had their Attorney (Isacc Crum) created a new List that no longer added to the identification by their description and including close to 20 tape numbers that could not have been in the deposit because Mark and Sarah King on Jhnody's instigation went to where they keep the audio tapes and reported to Jhnody (Falcon) those tape numbers were never among the tapes they had. So Mark and Sarah King either knew or should have known that that Deposit was not for 486 audio tapes. So there is no genuine record of which tapes were copyrighted and which tapes were assigned through Probate or through the Breyer Settlement; **"tape logs, metadata, archive completeness,"** (What was the source data for Mr. Isacc Crum's creation of the 1997 submitted audio cassettes. Why don't Plaintiffs have that report from the copyright office and if they never had it, can't they buy it, so that someone would have to go to the office and photograph that exact tape labels. When Havel asked Plaintiffs for that information from the copyright office they replied that it's not in their scope of responsibilities to provide it – go get it for oneself (which I could never afford to do) . Also upon examination of the two new tape logs Mr. Isacc Crum constructed and doctored to have all the same descriptions of "Various Discussions" as opposed to the robust description shown on the cassette tapes and logs produced by the Group and what Plaintiffs use as Exhibit H in their Complaints that came from Havel's blog: sawyerhg.wordpress.com). It's interesting when examining the two Lists produced by Mr. Isacc Crum that close to 100 tapes were now missing as a renumbering took place starting a little after the 800's of tape numbers. I have Mark King on record in several places saying there were 1061 audio tapes. But List 2 counts to 1082 which might account for

some 20 that were never there that were noted in the Groups tapes logs that Rkkody had that for some reason Plaintiffs didn't want to provide to Havel in Discovery.

**"and prior circulation of the works. It held that the registration evidence established prima facie validity and that Defendants' generalized assertions concerning logs, numbering, metadata, and deposit descriptions did not identify inaccuracies that undermined ownership of the registered works."** (Dkt. 287, page 2)

(but we still don't know what audio cassettes were registered or unregistered except if we believe that List 1 and List 2 are accurate which has been proven neither are). Those tapes with the copyright office could be blanks or could contain music from the spheres and the lack of a probate audio cassette inventory also provides no evidence tied to any infringement without audio tape numbers).

Here are some points I hope the Court will revisit and that Havel will provide better documentation for if that redress of the Summary Judgement Order is revisited.

**I. TELAH ANSWERS WHICH TAPES IT ALLEGES HAVEL PLAYED, BUT NOT WHICH REGISTERED WORKS THOSE TAPES REPRESENT -** TELAH emphasizes that the Court found that "the record identified the specific audio tapes Mr. Havel played." Dkt. 287 at 6. Havel does not dispute that finding for purposes of this motion. But identifying a tape number as something allegedly played is not the same proposition as establishing that the numbered tape is one of the protected works owned by Plaintiff.

The First Amended Complaint identifies recordings by numbers including 149, 263, 004, 030, 161, 156, 011, 054, 052, 050, and 200 through 204. Dkt. 132 ¶ 51. The Court relied on those allegations in discussing the specificity of the alleged infringement. Dkt. 276 at 7, 24–26.

The missing bridge is this: where is the evidence establishing that each particular numbered recording allegedly played by Havel is one of the particular works covered by Registration No. SRu00298530 and one of the intellectual-property interests transferred through the probate proceeding?

TELAH's Dkt. 287 response identifies no Copyright Office deposit inventory mapping the 486 deposited recordings to the tape numbers alleged in the complaint. It identifies no probate inventory mapping those same numbers to the property transferred through the probate settlement. It identifies no complete master-copy list or other record that supplies that connection. The Court itself recognized the underlying evidentiary problems: gaps and unavailable tapes, the absence of a complete master-copy list, and probate and settlement documents that do not identify or inventory individual audio tapes. Dkt. 276 at 5–6. Those are not merely bookkeeping issues when Plaintiff's theory depends upon particular numbered recordings.

**II. THE 486-RECORDING REGISTRATION DOES NOT, BY ITSELF, IDENTIFY THE COMPLAINT NUMBERS AS PART OF THE REGISTERED DEPOSIT** - TELAH's response does not confront the distinction Plaintiff itself previously made. In its June 30, 2023 proposed preliminary-injunction order, Plaintiff distinguished the 486 recordings covered by Registration No. SRu298530 from tapes 487 through 1082, which Plaintiff described as "Unregistered Works." Dkt. 120 at 1–2. Havel does not argue that an unregistered work can never be protected by copyright, and he does not argue that every registration discrepancy invalidates a registration. The point is narrower: a registration for a defined group of 486 recordings does not, without an evidentiary bridge, establish that every particular numbered recording later identified in litigation is among those 486 works. The absence of individual tape

numbers in the probate materials presents the same problem. The probate settlement may establish what property and intellectual-property interests were transferred, but it does not itself identify which later-numbered physical recording corresponds to which registered work. The registration and the probate transfer are separate links in the asserted chain of title; the record must connect them to the particular work alleged to have been infringed.

**III. UNICOLORS DOES NOT ELIMINATE THE PARTICULAR-WORK IDENTIFICATION QUESTION -** TELAH relies on the Court's conclusion that Havel and Weaver did not establish that discrepancies in tape logs, numbering, metadata, or deposit descriptions invalidated the registrations. Dkt. 287 at 3 n.1; Dkt. 276 at 12. Havel does not ask the Court to revisit that conclusion merely to invalidate a registration. Unicolors, Inc. v. H&M Hennes & Mauritz, L.P., 595 U.S. 178 (2022), concerns inaccuracies in copyright-registration applications and the circumstances in which an inaccuracy affects the registration under 17 U.S.C. § 411(b). It does not hold that a registration eliminates the need to identify the copyrighted work allegedly infringed or that a registration for a defined group of works establishes the identity of every physical recording in a disputed archive. The question here is whether the particular numbered recordings Plaintiff alleges Havel used are the particular works covered by that registration. Dkt. 287 does not identify evidence that answers that question.

**IV. THE 1999 PROBATE SETTLEMENT DOES NOT SUPPLY THE MISSING TAPE-BY-TAPE CONNECTION -** Havel does not ask the Court to disregard its conclusion concerning the probate transfer, and he does not contend that physical possession transferred copyright. The issue is scope and identification. The August 11, 1999 probate settlement transferred specified property and intellectual-property rights held through the probate administration. The settlement materials, however, do not provide an individual inventory

matching the numbered recordings now alleged in this case. Thus, the settlement does not by itself establish that each complaint number corresponds to a particular copyrighted work included in the property transferred through probate. The relevant chain is: particular numbered recording; particular copyrighted work; particular registered work or other protected right; and particular intellectual-property interest transferred through probate. TELAH's response identifies the components of that chain in general terms, but does not identify the evidence connecting them for the particular recordings at issue.

**V. THE CORE ISSUE WAS RAISED BEFORE SUMMARY JUDGMENT; IT IS NOT A NEW THEORY** - TELAH argues that Havel is attempting to raise a new theory after summary judgment. Dkt. 287 at 5–7. The core issue was already in the record. Havel's prior filings addressed the registrations, tape numbering, missing and unavailable tapes, archive completeness, deposit materials, and the probate settlement. The August 26 Order itself discusses those issues. Dkt. 276 at 5–6, 12. The Rule 54(b) motion therefore does not depend upon treating old historical facts as newly discovered evidence. It asks the Court to reconsider the legal consequence of factual distinctions the Court itself recognized. Rule 54(b) permits revision of an interlocutory order before final judgment. See Fed. R. Civ. P. 54(b); Galvan v. Norberg, 678 F.3d 581, 587 (7th Cir. 2012); Bank of Waunakee v. Rochester Cheese Sales, Inc., 906 F.2d 1185, 1191 (7th Cir. 1990).

**VI. THE OMNIBUS RESPONSE SHOULD NOT BE TREATED AS RESOLVING ISSUES THAT BELONG ONLY TO OTHER DEFENDANTS** - TELAH filed one omnibus response to the three Rule 54(b) motions. Dkt. 287. Some statements refer to "Defendants" collectively even though the motions address materially different claims. TELAH correctly observes that Count III was adjudicated against Weaver, not Havel. Havel does not seek

reconsideration of a Count III liability determination against him. To the extent his motion could be read otherwise, he withdraws that portion of the requested relief. His motion concerns Counts I, IV, and V as adjudicated against him. These distinctions matter because generalized assertions in Dkt. 287 should not be treated as a response to factual or legal issues Havel did not raise, nor should the three defendants' separate motions be treated as interchangeable.

**VII. COUNT V SHOULD BE TIED TO THE PARTICULAR UNDERLYING WORKS AND CONDUCT -** Havel recognizes that Dkt. 276 adjudicated Count V against him. His request is narrower than a wholesale relitigation of contributory infringement. If the particular underlying works remain subject to the identification issue described above, the Court should clarify the precise works and acts supporting the Count V determination.

That clarification is important before damages or equitable relief is calculated. A contributory-liability determination should rest on identified underlying works and identified conduct, not on an undifferentiated historical archive.

**VIII. LIABILITY SHOULD NOT BE CONVERTED INTO A LIBRARY-WIDE REMEDY -** TELAH states that damages and remedies remain for later proceedings. Dkt. 287 at 9. Havel agrees. But that makes work-specific clarification important now. If the liability determination is treated as covering an undifferentiated archive, the later remedies proceeding could become broader than the works and conduct actually adjudicated.

Havel therefore requests that any liability determination carried forward into the remedy phase identify the particular works, registrations or other rights relied upon, the particular acts attributed to him, and the period and theory of infringement. This does not ask the Court to decide final damages now. It asks the Court to prevent a work-specific liability determination from becoming a library-wide adjudication.

**IX. CONCLUSION -** TELAH has answered the question of which numbered recordings it alleges Havel played. It has not answered the separate question of how the record establishes that those numbered recordings are the particular copyrighted works covered by the registration and the particular intellectual-property interests transferred through probate.

Additionally included are other points Havel seeks clarification of the handling of by the Court. Havel can provide links to all the court records filed before and during the Summary Judgement related filings, to prove these points as worthy to re-consider as legitimate Disputes to justify a redress of what must come under the Courts Summary Judgement Order:

1. GRANT his Rule 54(b) Motion, Dkt. 284, as to Count I, or alternatively clarify that the identity of the particular audio works allegedly infringed and their connection to Plaintiff's registered works and asserted chain of title remain subject to factual determination;

2. Clarify that identification of the numbered tapes Havel allegedly played does not, standing alone, establish that those numbered recordings are the particular registered works Plaintiff claims to own;

3. Clarify that neither the existence of Registration No. SRu298530 nor the general transfer of intellectual-property interests through the 1999 probate settlement, standing alone, establishes the tape-by-tape connection between the recordings identified in the First Amended Complaint and the particular registered works;

4. Clarify why Plaintiffs Audio Copyright registration is considered legitimate when Judge Guy Schall's decision and the Sansone Trial Brief did not count them as legitimate indicating that Plaintiffs' provided no documentation to justify their filing any of their many Copyrights they listed and even suggested Mark and Sarah King may have filed them "fraudulently".

5. Clarify why Havel wasn't justified to giving away any of the Groups Information he obtained from Rkkody in 1997 and 1998 CD's that included: the Groups website Heavensgate.com, Audio only of the Beyond Human Video tapes, Approx. 196 Audio tapes in .rm format that Rkkody digitized from Audio cassettes he legitimately retrieved from Storage in March of 1997 with Mark and Sarah King's blessing, which was before San Diego confiscated that Storage room and included three images of Older Members painted by Ollody and others he painted and included the HeavensGate book text and a number of additional documents not included in their Book that Rkkody also copyrighted using the same copyright notice the Group put on their Heavensgate.com website under the Book tab.

6. Clarify why it isn't a legitimate Dispute of Plaintiffs claim that Havel did not have permission and a type of license to distribute the Groups Intellectual Property when Mark and Sarah King sent Havel two cases of the Heavensgate Book version they had printed known as the Purple Book and a set of the 7 Beyond Human Video Tapes that show the copyright the Group used on the tape jackets "Copyright Total Overcomers Anonymous Monastery" and two CD's containing a total of 4 Audio tapes with no instructions on what to do with them?

7. Clarify why the key document providing instructions on how to disseminate and distribute Rkkody's audio tape CD's, video's, books, etc. to the public, referred to by Judge Breyer in his 1999 Settlement with Morea (Rkkody's daughter) as the "Settlement Agreement" wasn't ordered (compelled) to be provided to Defendant Havel after asking for it in several parts of Discovery, (when Judge Gotsch said the Court could get it) and that Plaintiffs Council Isacc Crum told Havel that's "maybe it was destroyed" but then said he asked about that and said the reply was something to the affect of "they didn't have it" in the Judge Frankel hearing.

8. Reconsider or clarify Count V to the extent the contributory-infringement determination depends upon identification of particular underlying copyrighted works and particular acts of contribution;

9. Clarify why there is not a legitimate Dispute over the legality of Plaintiffs copyright registration of their C.B.E. (Celestial Being Entity) Lithographic Print Sarah King testified to Judge Lisa Guy Schall in the Probate Case was a gift from the Group and that Judge Guy-Schall said that there was no evidence from the Group that authorized Plaintiffs to copyright it in 1997 and in light of the existence of a 1982 copyright registration of 14 Acrylic paintings painted by David Cabot Van Sinderen and in light of the evidence that Rkkody was given by the Group that same image in a frame that he was offering for sale on Rkkody.com in 1997 and gave to Havel on the two CD set sent to Havel in 1997 and 1998 and in light of the evidence that Rkkody was first given the website Heavensgate.com that Plaintiffs sued to get control of after his death in 1998 by threatening his daughter with losing her house to fight against and have now considered it their property and **suing Weaver for thinking about making a Plush Doll** from and against Havel for displaying on his Youtube 3spm website since 2008.

10. Grant such other relief as the Court deems just and proper.

Respectfully submitted:

Date: 10-05-2026

Stephen Havel

STEPHEN HAVEL, Defendant, pro se